No. 27327

**The Mountain States Telephone and Telegraph Company, a Colorado corporation v. The Public Utilities Commission of the State of Colorado and Henry E. Zarlengo, Edythe S. Miller and Edwin R. Lundborg, Commissioners**

No. 27333

**The Colorado Municipal League, a corporation v. The Public Utilities Commission of the State of Colorado; Howard S. Bjelland, Edwin R. Lundborg, Henry E. Zarlengo and Edythe S. Miller, as successor in office to Howard S. Bjelland, Commissioners and The Mountain States Telephone and Telegraph Company, a corporation**

(576 P.2d 544)

Decided March 20, 1978.

Coleman M. Connolly, for Mountain States Telephone and Telegraph Company in Case No. 27327 and Case No. 27333.

Gorsuch, Kirgis, Campbell, Walker and Grover, Leonard M. Campbell, Gary S. Cohen, for The Colorado Municipal League.

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edward G. Donovan, Solicitor General, John E. Archibold, Special Assistant, for The Public Utilities Commission of the State of Colorado; Howard S. Bjelland, Edwin R. Lundborg, Henry E. Zarlengo and Edythe S. Miller, as successor in office to Howard S. Bjelland, Commissioners.

*En Banc.*

MR. JUSTICE HODGES delivered the opinion of the Court.

The appeals in the above captioned cases have been consolidated as both present issues regarding Decision No. 86103 of the Public Utilities Commission (PUC). Portions of this decision were challenged in the trial court by the appellants, Mountain States Telephone and Telegraph Company (Mountain Bell) and by the Colorado Municipal League (League). The district court, which also considered the issues presented in each case on a consolidated basis, affirmed the PUC decision. We affirm the district court's judgment.

Mountain Bell sought higher rates when it filed with the PUC its advice letter accompanied by revised tariff sheets which set forth a general repricing of the various telephone services rendered by Mountain Bell within the state of Colorado. The imposition of the higher rates was suspended by the PUC and hearings were scheduled in accordance with section 40-6-111(1), C.R.S. 1973. The League intervened as a protestant against higher rates.

The PUC conducted public hearings in Denver and in other Colorado cities. Extensive testimony and other evidence in support of and against higher rates were presented during the hearings which consumed approximately 37 days. Also, as a basis for its judgment of what constitutes just and reasonable rates, the PUC heard testimony and received exhibits presented by several expert witnesses, including members of the PUC staff, all of whom related their analysis, opinions, and recommendations concerning rate base, return on rate base, capital structure, rate of return on common equity and other items. *See* section 40-3-101, C.R.S. 1973. Thereafter, on December 20, 1974, the PUC issued Decision No. 86103 which granted Mountain Bell higher rates. Mountain Bell's requested rate increase would have produced additional annual gross revenue of at least $36,720,400. The PUC's decision granted Mountain Bell a gross revenue increase of $28,354,106 or $8,366,294 less than it requested.

Here, as in the trial court, Mountain Bell asserts that the PUC in Decision No. 86103, (1) improperly ordered Mountain Bell to pay attorneys' fees, costs and expenses of the League, (2) erroneously disallowed $788,000 of Mountain Bell's Federal income tax expense in its rate computations, (3) failed to recognize the increased cost of imbedded debt incurred during the pendency of this rate case before the PUC, and (4) did not take into consideration certain toll repression alleged by Mountain Bell as an item affecting its need for higher rates.

The League, in the district court action initiated by it, challenged the increased rates granted by the PUC. In this appeal, the League takes issue only with that portion of the PUC decision which granted the League a $4,000 expert witness fee rather than the $12,500 it had paid to a Mr. Kosh. Otherwise, the League argues in support of the PUC decision with respect to the four contentions made by Mountain Bell in its appeal and itemized in the foregoing paragraph.

The issues presented in these appeals involve complex facts and arguments, which will be summarized in the discussion of each of the issues.

## I.
### *Attorneys' Fees and Costs Awarded to the League*

As part of Decision No. 86103, the PUC directed Mountain Bell to pay attorneys' fees, expert witness fees, and costs incurred by the League as a protestant-intervenor in this rate case. The total amount of these fees and costs was $19,500 which the PUC ordered Mountain Bell to remit to the League within 60 days from the effective date of its order.

Mountain Bell urges that we invalidate this award of attorneys' fees and costs on the ground that the PUC has no statutory or other authority to make such an award. We do not agree that the PUC has no such authority.

We hold that authority to make such an award emanates from Art. XXV of the Constitution of the State of Colorado which delegates to the PUC legislative authority and power not only to issue certificates of public convenience and necessity but also to regulate rates to be charged by public utilities. This legislative authority which the PUC exercises is well described and delineated in *Miller Bros., Inc. v. PUC*, 185 Colo. 414, 525 P.2d 443 (1974) as follows:

". . . Colo. Const. Art. XXV has granted to the Commission authority to issue certificates of public convenience and necessity . . . This is a legislative function . . . and, until the General Assembly restricts it, the Commission has as much authority as the legislature possessed prior to the adoption of Article XXV in 1954."

The power to authorize the award of attorneys' fees and other legal costs in cases tried before administrative bodies is generally accepted as a fundamental legislative prerogative. Under our constitution, the legislative authority in public utility matters has been delegated to the PUC and the legislature has not by any statutory enactment restricted it in the matter of awarding attorney fees and other legal costs. On the contrary, we deem the following statute to be a recognition and a more specific grant by the legislature of authority in this and other areas of rate regulation. Section 40-3-102, C.R.S. 1973 provides:

"*Regulation of rates — correction of abuses.* The power and authority is hereby vested in the public utilities commission of the state of Colorado and it is hereby made its duty to adopt all necessary rates, charges, and

regulations to govern and regulate all rates, charges, and tariffs of every public utility of this state to correct abuses; to prevent unjust discriminations and extortions in the rates, charges, and tariffs of such public utilities of this state; to generally supervise and regulate every public utility in this state; *and to do all things, whether specifically designated in articles 1 to 7 of this title or in addition thereto, which are necessary or convenient in the exercise of such power,* and to enforce the same by the penalties provided in said articles through proper courts having jurisdiction." (Emphasis added.)

It can therefore be said that the PUC in the area of utility regulation, including rate making, has broadly based authority to do whatever it deems necessary or convenient to accomplish the legislative functions delegated to it.

In support of the foregoing propositions, *Mountain States Telephone and Telegraph Company v. PUC*, 180 Colo. 74, 502 P.2d 945 (1972), held that it was within the jurisdiction of the PUC to award attorney fees to the League out of a refund amount which Mountain Bell was required to divide among its consumers. Confronted with that case, Mountain Bell in its brief argues that all it did was to recognize a "common fund" theory which would justify the award of attorney fees. Accordingly, Mountain Bell argues that since no refund has been awarded in the instant case, no "common fund" has been created from which attorneys' fees may be paid. We do not subscribe to this argument because in our view that case discloses that the existence of a common fund was only an incidental consideration in concluding that the PUC has authority to award attorneys' fees in certain cases justifying such an award.

On the basis of the constitutional and statutory grant of legislative authority, the PUC has always allowed Mountain Bell to charge off as a proper operating expense attorneys' fees and legal costs incurred in its efforts before the PUC to increase rates. The League's attorneys' fees and other legal costs advanced in this case for the purpose of protesting higher telephone rates on behalf of all consumers, fall into the same category. This is so because the award was made only after the PUC concluded that the protestant-intervenor (League) conformed to the standards which the PUC previously adopted as a prerequisite to awarding any attorney fees or other legal costs incurred by the League during the pendency of this case before the PUC. In its decision, the PUC set forth the following standards as a basis for this award:

"The representation of the Protestant-Intervenor and the expenses incurred relate to general consumer interests and not to a specific rate or preferential treatment of a particular class of ratepayers.

"The testimony, evidence and exhibits introduced in this proceeding by the Protestant-Intervenor have or will materially assist the Commission in fulfilling its statutory duty to determine the just and reasonable rates

which Mountain Bell shall be permitted to charge its customers.

"The fees and costs incurred by the Protestant-Intervenor for which reimbursement is sought are reasonable charges for the services rendered on behalf of general consumer interests."

By applying these standards and finding that the League's efforts in this case met these criteria, we hold that not only did the PUC have the authority to make the award but that it was made in accordance with appropriate guidelines.

## II.
### *Expert Witness Fee Award Challenged by League*

The League takes issue with the fact that the PUC did not award the full amount which it had to pay a Mr. Kosh, who was used as an expert witness by the League. Mr. Kosh charged a flat expert witness fee of $25,000, half of which the League agreed to pay. The other half was paid by the General Services Administration, which was also a protestant against higher Mountain Bell rates. The PUC awarded the League $4,000 of the $12,500 which it paid to Mr. Kosh. The League urges this court to reverse that portion of the PUC's decision, and to enter a mandate awarding the League full reimbursement by requiring Mountain Bell to pay another $8,500 to the League.

The League characterizes the PUC's action in not awarding the full $12,500 to the League as arbitrary, capricious, and not supported by the record. We reject the League's contentions and hold that the PUC acted reasonably in setting what it considered a fair charge for the services of this expert witness.

The League argues that the flat fee of $25,000 charged by Mr. Kosh is reasonable because he is acknowledged to be an outstanding rate of return expert in the public utilities field; that he has participated in many rate proceedings; that he has a national reputation as an expert; and that he has been favorably mentioned by commissions and courts for his expert assistance in public utility rate cases.

On the matter of attorneys' fees, expert witness fees and other legal costs to be awarded to the League, the PUC held a hearing and in its decision made the following finding with reference to this particular expert witness fee:

"Mr. Kosh testified that his fee for services was not based upon any hourly or daily rate but was a flat fee of $25,000 half of which (or $12,500) is sought by the League by way of reimbursement. We note that Dr. Christy, the expert witness who appeared for Mountain Bell, charges $200 per day for time spent in hearings, and $150 per day for work done at his home or office. We find that a daily rate of $200 per day for hearing time is reasonable. Mr. Kosh testified for one day, and his assistant, Dr. Lurito, testified on one day and was present in the hearing room several other days. We estimate that a total of twenty days' hearing and non-hearing time is

reasonable with respect to the participation of Mr. Kosh and Dr. Lurito in this proceeding."

On the basis of the foregoing finding, the PUC concluded that $4,000 was a reasonable amount to award as a witness fee for Mr. Kosh in this case. The PUC in effect, rejected the "flat fee" concept urged by the League and properly made a determination based upon actual time spent by this expert witness and his assistant in testimony, appearances, and preparation time. In addition, the PUC made a determination based on sound factors of a reasonable per day charge for the services of this expert witness.

█ A flat fee for an expert witness is not *per se* a reasonable fee. When dealing with a matter which affects the general public interest as here, the PUC must make a determination that the attorneys' fees and other legal costs are fair and reasonable. Such costs have an effect on rates which a public utility will charge the general public for its services. Just as the PUC has the power and authority to determine what are just and reasonable rates as described in section 40-3-101(1), C.R.S. 1973, it has the concomitant duty to approve only those charges, payable by rates, which it finds are fair, just and reasonable. Here, the record reveals that the PUC properly performed its duty with respect to this expert witness fee charge.

III.

### PUC Disallowance of $788,000 of Mountain Bell's Federal Income Tax Expense

█ Mountain Bell contends that the disallowance of $788,000 as a Federal income tax expense is unsupported by any evidence in the record and is an unlawful abuse of the PUC's discretion. We do not agree with either of these assertions. Our review of the record reveals an adequate basis for this disallowance. The PUC did not abuse its discretion in this matter, but on the contrary, it properly acted within its power and authority when it recognized and identified a Federal income tax expense which should not have been charged against revenue in the rate regulation process.

To understand why this disallowance is proper, a brief explanation of the method by which Mountain Bell pays its Federal income tax is necessary.

The Federal tax regulations and statutes permit affiliated companies to file income tax returns on a consolidated basis. The main condition, before such consolidation is allowed, is that all subsidiary corporations must be at least 80% owned by the parent corporation. Certain tax advantages and savings flow from this election. American Telephone and Telegraph Company (AT&T) owns over 80% of the stock of Mountain Bell and other affiliates in the Bell telephone system including Western Electric.

The amount of Federal income tax which Mountain Bell showed as an expense during the test year which was used as a basis for setting the rates here, was approximately $17,636,000. This figure represents the

Federal income tax which Mountain Bell would pay if it were a single corporate taxpayer. AT&T in its consolidated return took credit for Federal income taxes on the taxable income of each of its affiliates. AT&T thereby realizes the tax advantages and savings.

The PUC made the following finding with reference to this disallowance:

''Another significant Staff adjustment to Mountain Bell's Colorado intrastate federal income taxes is an adjustment in the amount of $788,000. We agree with Mr. Richards of the Commission Staff who testified that Mountain Bell's federal income tax expense was based upon the fiction that Mountain Bell in fact paid federal income taxes of $17,636,000. This figure assumes that Mountain Bell paid federal income taxes as a single corporate taxpayer. In fact, Mountain Bell's federal income taxes are paid to the federal government through the medium of a consolidated tax return filed by AT&T. The result of a consolidated filing means that Mountain Bell's dollar contribution is some $788,000 less than what it reportedly would pay as a single taxpayer.''

We note particularly the testimony presented by Mr. Norman W. Leake, a Mountain Bell witness, who testified, among other things, that although the total final Federal income taxes paid by the entire Bell System is based upon a consolidated income tax return, the amount of money paid by Mountain Bell to the Federal government is based upon Mountain Bell's taxable income. Undoubtedly, from this testimony, the commission inferred, and properly so, that the internal accounting practices of the Bell System credits any tax benefits and savings attributable to the filing of the consolidated return to AT&T and not to its operating companies.

In a leading case on this subject, *Federal Power Commission v. United Gas Pipe Line Company*, 386 U.S. 237, 87 S.Ct. 1003, 18 L.Ed.2d 18 (1967), the issue was whether the Federal Power Commission could reduce for rate making purposes the Federal income tax expense claimed by United Gas Pipe Line Company, which participated in a consolidated income tax return with affiliated companies. The United States Supreme Court therein stated:

"United had not filed its own separate tax return. Instead it had joined with others in the filing of a consolidated return which resulted in the affiliated group's paying a lower total tax than would have been due had the affiliates filed on a separate-return basis. *The question for the Commission was what portion of the single consolidated tax liability belonged to United. Other members of the group should not be required to pay any part of United's tax, but neither should United pay the tax of others. A proper allocation had to be made by the Commission.* Respondents insist that in making the allocation the Commission would violate the statute unless in every conceivable circumstance, including this one, United is allowed an amount for taxes equal to what it

would have paid had it filed a separate return. In their view, United should never share in the tax savings inherent in a consolidated return, even if on a consolidated basis system losses exceed system gains and neither the affiliate group nor any member in it has any tax liability. This is an untenable position and we reject it. Rates fixed on this basis would give the pipeline company and its stockholders not only the fair return to which they are entitled, but also the full amount of an expense never in fact incurred. In such circumstances, the Commission could properly disallow the hypothetical tax expense and hold that rates based on such an unreal cost of service would not be just and reasonable." (Emphasis added.)

The Supreme Court of the United States then approved the method chosen by the Federal Power Commission to allocate the tax liability of a system among the regulated members of a group which pays its taxes on a consolidated basis and stated further:

"If there is more than one regulated company in a group, they will share the tax liability or tax saving in proportion to their taxable income."

The method utilized by the PUC in this rate making proceeding was that approved in the *United Gas Pipe Line Company* case. What the PUC did here, in effect, was to allow as an expense for rate making purposes that portion of the tax liability of the Bell System, determined on a consolidated basis, which was in proportion to Mountain Bell's taxable income.

In *Chesapeake and Potomac Telephone Company of Maryland v. Public Service Commission of Maryland*, 230 Md. 395, 187 A.2d 475 (1963), the court on the same issue stated:

"We think the commission was justified in its action [in disallowing for rate-making purposes an income tax expense of $144,110]. The owner and managers of the company have the right to determine what its debt-equity ratio should be, but they may not always make the ratepayers foot the bill resulting from the choice. *There was no legal need for the company to pay more than its proportionate share of the joint tax liability. It has not shown any reason or necessity for its assumption of a tax liability greater than it owed or any particular consideration passing to it from AT&T . . . for contributing a gift to that owner.*

". . . Since liability for taxes was figured on the theory of one system-wide entity, liability might fairly be set, as the Commission set it, among the component entities on a proportionate basis. *There would seem to be no reason why Maryland telephone subscribers should pay more than the company's proportionate share of the total Bell System tax liability.*" (Emphasis added.)

*See also Southwestern Bell Telephone Company v. Kansas State Corporation Commission*, 192 Kan. 39, 386 P.2d 515 (1963).

In summary, it must be pointed out that the PUC did not find that Mountain Bell had paid $788,000 less than it would have paid if it had

filed a separate Federal income tax return. In effect, the PUC properly found that Mountain Bell paid monies to the Federal government at a single rate. AT&T, in the consolidated return, credited Mountain Bell with this payment, and thus, AT&T received the income tax advantage. The PUC found that Mountain Bell's share of this tax advantage was $788,000, which it properly determined should not be borne by Colorado ratepayers.

By this disallowance, Mountain Bell also argues that the PUC is unlawfully discriminating against its minority stockholders by allocating certain tax advantages to Colorado ratepayers. If this be so, the disadvantage cannot be blamed on the PUC. It properly exercised its power and authority to adjust Federal income tax expenses of a public utility which joins in a consolidated return filed by a parent company, which in turn, gains the resultant tax savings and benefits. *Federal Power Commission v. United Gas Pipe Line Company, supra; Southwestern Bell Telephone Company v. Kansas State Corporation Commission, supra;* and *Chesapeake and Potomac Telephone Company of Maryland v. Public Service Commission of Maryland, supra.*

## IV.
### *Increased Cost of Imbedded Debt Not Allowed by the PUC*

 Mountain Bell contends that the PUC abused its discretion and violated established Colorado case law by ignoring Mountain Bell's increased cost of imbedded debt. In our analysis of this issue, we detect no abuse of discretion and we affirm the PUC's treatment of this issue.

The past test year period adopted by the PUC for the purpose of setting Mountain Bell's rates was April 1, 1973 to March 31, 1974. In August of 1974, Mountain Bell issued additional long term debt. Thereafter, and during the course of the PUC hearings, Mountain Bell for the first time brought this additional long term debt to the attention of the PUC and requested that the cost of this additional long term debt be allowed as an out-of-period adjustment to expenses.

We hold that the PUC was justified in not authorizing this out-of-period adjustment in its rate calculations. It was presented much too late to enable the PUC and its auditing staff to analyze and evaluate its significance and impact, if any. This request by Mountain Bell is comparable to and was undoubtedly related to Mountain Bell's late motion to audit for a test year ending June 30, 1974 rather than the test year used which ended March 31, 1974. This motion by Mountain Bell was made when hearings were about to commence and the PUC and its staff were about to complete the complicated and time-consuming audit of Mountain Bell's records for the test year. In its findings, the PUC described the serious problems generated if such a motion were to be granted. The PUC concluded that the granting of this late motion would involve an undertaking amounting to a "near physical impossibility." It therefore properly denied

the motion and rejected consideration of this out-of-period adjustment.

By statute, the PUC has the responsibility of expeditiously completing its investigations, audits, hearings, and decision within the 210-day maximum period of suspension. *See* section 40-6-111, C.R.S. 1973. The PUC must also "conduct its proceedings in such a manner as will best conduce the proper dispatch of business and the ends of justice." Section 40-6-101. To have accommodated the late request and the late motion of Mountain Bell with respect to the additional cost of imbedded debt and to have changed the test year period would have been inconsistent with statutory guidelines, and would have unduly prolonged and complicated the scheduled procedures.

Mountain Bell cites *Mountain States Telephone and Telegraph Company v. Public Utilities Commission*, 182 Colo. 269, 513 P.2d 721 (1973) as authority under which the PUC should have properly complied with Mountain Bell's late request with reference to out-of-period adjustments. We therein stated:

"The relationship between costs, investment, and revenue in the historic test year is generally a constant and reliable factor upon which a regulatory agency can make calculations which formulate the basis for fair and reasonable rates to be charged. These calculations obviously must take into consideration in-period adjustments which involve known changes occurring during the test period which affect the relationship factor. Out-of-period adjustments must be also utilized for the same purpose. An out-of-period adjustment involves a change which has occurred or will occur, or is expected to occur after the close of the test year. An increase in the public utility taxes effective after the test year is a good example of such an adjustment. Wages and salary increases which have been contracted for and which will take effect after the test year must also be analyzed in the process of calculations. Such wage and salary increases may not exceed to any large extent the usual consequent increase in the productivity of the employees. If they do, which is generally the case in periods of uncontrolled inflation, then such out-of-period adjustment must be reckoned with in the rate fixing procedure. These are matters which must of necessity be of substantial concern to a rate fixing regulatory agency of the government when it considers all the evidence and all the factors available to it in a rate case."

The foregoing quotation clearly emphasizes that only out-of-period adjustments, which are contracted for during the test year period but do not take effect until after the conclusion of the test year period, should be considered. In like manner, a change in tax laws during the test year to become effective after the test year would fall into the same category. Here, the debt issue which Mountain Bell wished to make the subject of an out-of-period adjustment was issued over four months after the conclusion of the test year period. Thus, the out-of-period adjustments which can

properly be considered by the PUC according to that case, do not include this out-of-period adjustment.

## V.
### *Disallowance by PUC of Toll Repression*

Repression is the word used to describe a reduction in revenue due to increase in charges. Mountain Bell contended before the PUC that when the increase in rates becomes effective, there will be a periodic drop in the use of the telephone for toll calls because of the higher charges. On this basis, Mountain Bell maintained that the projected revenue from the repricing of toll services should be adjusted downward.

The only evidence which Mountain Bell introduced in support of toll repression was based on a computer demand model. During the course of the hearings, one of the PUC commissioners questioned a PUC staff witness who described the computer demand model presented as follows:
"Basically in this case, sir, it is a computer program into which you can put certain data. That data is manipulated and it comes out with the certain output information. In this case what you do is you put in a hypothetical rate structure and this model will then tell you, based on certain pieces of information like the business activity index and the Consumers Price Index, things like this, it will predict what — how many fewer toll calls will be made."

No evidence was presented that toll repression, if any, occurred as the result of previous increases. The PUC declined to allow any repression allowance. Mountain Bell argues that this "was totally arbitrary and capricious" and requests this court to order the PUC to amend its decision to allow for toll repression.

It appears obvious from the record that the PUC was not persuaded by the computer evidence. Mountain Bell contended that since no evidence contesting its computer evidence was presented, the PUC must accept it. We reject this contention. If in the judgment of the PUC evidence is insufficient to establish that a particular result will occur, it is within its prerogative to decline to find that such a result will occur. Furthermore, the record reveals that PUC commissioners questioned a witness as to whether repression had ever occurred as the result of prior toll rate increases. The answers indicated that no information regarding this had been obtained. From this, the PUC could properly infer that since no proof of past repression was offered, it was unlikely that it would occur as the result of the rate increase sought to be authorized.

We find nothing in the record to justify reversing the PUC's ruling which rejected any allowance for toll repression.

Judgment affirmed.

MR. CHIEF JUSTICE PRINGLE and MR. JUSTICE KELLEY do not participate.