No. 28151

**Mountain States Legal Foundation v. Public Utilities Commission of the State of Colorado, et al., Mountain Plains Congress of Senior Organizations, Citizens Utilities Company, et al., and Colorado Association of Commerce & Industry v. Public Utilities Commission of the State of Colorado, et al., Mountain Plains Congress of Senior Organizations, Citizens Utilities Company, et al.**

(590 P.2d 495)

Decided January 29, 1979.                    Rehearing denied February 26, 1979.

Kea Bardeen, James G. Watt, for plaintiff-appellee, Mountain States Legal Foundation.

J. D. MacFarlane, Attorney General, David W. Robbins, Deputy, Tucker K. Trautman, Assistant, for defendants-appellants, Public Utilities Commission of the State of Colorado, Edwin R. Lundborg, Edythe S. Miller and Sanders G. Arnold, Commissioners.

Irvin M. Kent, for intervenor-appellant, Mountain Plains Congress of Senior Organizations.

Walker D. Miller, Robert T. James, John J. Conway, for amicus curiae, The Colorado Rural Electric Association.

John Fleming Kelly, James L. White, Jeffrey C. Pond, B. Lynn Winmill, Holland and Hart, for petitioner-appellee, Colorado Association of Commerce & Industry.

John R. Barry, for Iowa Electric Light & Power Company.

T. N. Wright, A. R. Madigan, for Peoples Natural Gas, Division of Northern Natural Gas Company.

Jones, Meiklejohn, Kehl & Lyons, Arthur R. Hauver, for Kansas-Nebraska Natural Gas.

58

Lefferdink, Lefferdink and Stoval, John J. Lefferdink, for Eastern Colorado Utility Company.


*En Banc*

MR. CHIEF JUSTICE HODGES delivered the opinion of the Court.


Plaintiffs-appellees, Mountain States Legal Foundation and Colorado Association of Commerce and Industry, commenced separate actions in the trial court challenging Public Utilities Commission (PUC) decisions which established a reduced gas rate for low-income elderly and low-income disabled persons. The trial court entered a judgment which set aside these decisions. It held that the adoption of this special reduced rate exceeded the PUC's authority under Article XXV of the Colorado Constitution and violated section 40-3-106(1), C.R.S. 1973. The appellant PUC and intervenor-appellant Mountain Plains Congress of Senior Organizations urge reversal. We affirm the trial court's judgment.

On November 8, 1977, the PUC, in two decisions, ordered gas utilities under its regulatory authority to implement a discount gas rate plan for low-income elderly and low-income disabled persons.[1] The resulting revenue loss for the discounted services would be recovered by higher rates on all other customers.

We give full recognition to the fact that many of our state's elderly live on fixed incomes which are severely strained by today's inflationary economy, as are low-income disabled persons who are often shut out of the employment market. While efforts to provide economic relief to such needy persons are laudatory, the PUC has limited authority to implement a rate structure which is designed to provide financial assistance as a social policy to a narrow group of utility customers, especially where that low rate is financed by its remaining customers.

---

[1] The low-income customers who would be eligible for the discounted gas rate are "identified" through a procedure utilized by the Department of Revenue to administer the Colorado property and rent credit program.

In order to qualify for the discounted rate, a customer must have been a full year resident of Colorado; the customer must be 65 years of age or older or be the surviving spouse, 58 years old or older, of a deceased spouse who met the age requirement, or the customer must be receiving full disability benefits from a bona fide public or private insurance plan; and if the discounted gas rate plan were to go into effect during the 1978-1979 heating season, a customer would have to have an income of $7,300 or less if single, and $8,300 or less if married. These income standards are different from those which were in effect during the 1977-1978 heating season because of a legislative change in the standards for the Colorado property tax and rent credit.

■ In *Mountain States Telephone and Telegraph Co. v. Public Utilities Commission,* 576 P.2d 544 (Colo. 1978), we held that Article XXV of the Colorado Constitution[2] gives the PUC full legislative authority to regulate public utilities. We noted in that case, however, that the legislative authority in public utility matters delegated by Article XXV to the PUC could be restricted by statute. *Id.* at 547. It is clear in the case before us that the PUC's authority to order preferential utility rates to effect social policy has, in fact, been restricted by the legislature's enactment of section 40-3-106(1), C.R.S. 1973[3] and section 40-3-102, C.R.S. 1973.[4]

■ Section 40-3-106(1), C.R.S. 1973, prohibits public utilities from granting preferential rates to any person, and section 40-3-102, C.R.S. 1973, requires the PUC to prevent unjust discriminatory rates. When the PUC ordered the utility companies to provide a lower rate to selected customers unrelated to the cost or type of the service provided, it violated section 40-3-106(1)'s prohibition against preferential rates. In this instance, the discount rate benefits an unquestionably deserving group, the low-income elderly and the low-income disabled. This, unfortunately, does not make the rate less preferential. To find otherwise would empower the PUC, an appointed, non-elected body, to create a special rate for any

---

[2] Article XXV was added to the Colorado Constitution in 1954. It reads:

"In addition to the powers now vested in the General Assembly of the State of Colorado, all power to regulate the facilities, service and rates and charges therefor, including facilities and service and rates and charges therefor within home rule cities and home rule towns, of every corporation, individual, or association of individuals, wheresoever situated or operating within the State of Colorado, whether within or without a home rule city or home rule town, as a public utility, as presently or as may hereafter be defined as a public utility by the laws of the State of Colorado, is hereby vested in such agency of the State of Colorado as the General Assembly shall by law designate.

"Until such time as the General Assembly may otherwise designate, said authority shall be vested in the Public Utilities Commission of the State of Colorado; provided however, nothing herein shall affect the power of municipalities to exercise reasonable police and licensing powers, nor their power to grant franchises; and provided, further, that nothing herein shall be construed to apply to municipally owned utilities."

[3] Section 40-3-106(1), C.R.S. 1973, states:

*"Advantages prohibited - graduated schedules.* (1) No public utility, as to rates, charges, service, or facilities, or in any other respect, shall make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities, or in any respect, either between localities or as between any class of service. The commission has the power to determine any question of fact arising under this section."

[4] Section 40-3-102 states:

"The power and authority is hereby vested in the Public Utilities Commission of the State of Colorado and it is hereby made its duty to adopt all necessary rates, charges, and regulations to govern and regulate all rates, charges, and tariffs of every public utility of this state *to correct abuses; to prevent unjust discriminations* and extortions in the rates, charges, and tariffs of such public utilities of this state; to generally supervise and *regulate every public utility in this state;* and to do all things, whether specifically designated in articles 1 through 7 of this title or in addition thereto, which are necessary or convenient in the exercise of *such* power . . . ." (Emphasis added.)

group it determined to be deserving. The legislature clearly provided against such discretionary power when it prohibited public utilities from granting "any preference." In addition, section 40-3-102, C.R.S. 1973, directs the PUC to prevent unjust discriminatory rates. Establishing a discount gas rate plan which differentiates between economically needy individuals who receive the same service is unjustly discriminatory.

To conclude, although the PUC has been granted broad rate making powers by Article XXV of the Colorado Constitution, the PUC's power to effect social policy through preferential rate making is restricted by statute no matter how deserving the group benefiting from the preferential rate may be.

We affirm the judgment of the trial court.

MR. JUSTICE PRINGLE and MR. JUSTICE CARRIGAN dissent.


MR. JUSTICE PRINGLE dissenting:

I respectfully dissent because I agree in principle with the views enunciated by Mr. Justice Carrigan in his dissenting opinion.

MR. JUSTICE CARRIGAN dissenting:

I respectfully dissent.

The question is whether, in adopting reduced gas rates for two classes of low-income customers — the elderly and the disabled — the P.U.C. has established preferential and unjustly discriminatory rates forbidden by sections 40-3-102 and 40-3-106(1). In my view the P.U.C. has acted within its constitutional and statutory authority.

The majority opinion acknowledges that the determination of utility rates is a purely legislative function which has been delegated, in the first instance, to the P.U.C. by Article XXV of the Colorado Constitution. This Court has previously stated that the P.U.C. in the area of utility ratemaking has "broadly based authority to do whatever it deems necessary or convenient to accomplish the legislative [ratemaking] functions delegated to it." *Mountain States Telephone and Telegraph Co. v. Public Utilities Commission,* 195 Colo. 130, 576 P.2d 544, 547 (1978).

Unfortunately, the majority opinion fails adequately to recognize that the P.U.C.'s legislative authority includes the power to initiate public policy in the narrow, specialized area of ratemaking, subject to the General Assembly's power to overrule any P.U.C. rate policy with which it disagrees. As I read the law, only the General Assembly, and not this Court, has authority to overrule the public policy embodied in a rate plan adopted by the P.U.C.

For example, for many years the P.U.C. has implemented a policy, created by it alone, charging lower rates for electric power to those who use larger amounts of electricity. *I.e.*, as the amount of electricity a customer uses goes up, the cost per unit goes down. Clearly, if the General Assembly should decide that such a policy unwisely encourages overuse, or waste, of electrical energy, it could overrule the policy by specific legislation. But this Court could not overrule it by case law if we were to conclude that the policy is unwise, unjust or unreasonable. The effect of the majority opinion, when considered in the light of applicable statutes and prior case law, is to overrule the contested P.U.C. rate scheme for essentially these policy reasons. In my view the Court's action today oversteps the bounds of judicial review of P.U.C. ratemaking and invades the legislative prerogative.

The majority opinion depends entirely on characterization of the special rate classification here involved as a "preference" forbidden by section 40-3-106(1). Thus the decisive issue is whether the instant rate classification is so clearly of the type that the legislature intended to forbid when it enacted that section that it must be held to be a "preference" as a matter of law. The majority opinion cites no precedent or other authority for its holding and we have found no case law from any state dealing with the issue. Moreover the majority opinion fails to define the term "preference" for guidance of the P.U.C. in future cases. In effect the majority opinion has condemned the rate scheme here involved by saying, "We can't define a 'preference' but we know one when we see one." Such an *ad hoc* determination does not provide needed rational standards as precedent for future cases.

Clearly the Colorado General Assembly could not actually have intended to outlaw the practice under review when it adopted the "preference" prohibition in 1913 (Colo. Sess. Laws 1913, ch. 127, § 18 at 473), for the P.U.C. did not create this rate plan until 1977 and it did not take effect until 1978. Obviously the 1913 General Assembly never contemplated and did not intend to prevent the P.U.C. from establishing lower gas rates for these two classes of customers, the low-income elderly and low-income handicapped.

Apparently, the purpose of section 40-3-106(1) was to prevent the public utilities' then-common practice of favoring certain customers with lower utility rates to the *competitive* disadvantage of others in the *same class* of customers similarly situated. *Columbia Gas of N.Y., Inc. v. N.Y. State Elec. & Gas Co.*, 28 N.Y.2d 117, 268 N.E.2d 790 (1971); *Hays v. Pennsylvania Co.*, 12 Fed. 309 (N.D. Ohio 1882).

The issue, therefore, becomes whether the statutory language so clearly forbids the P.U.C.'s rate classification plan that this Court, *as a matter of law*, must outlaw it rather than leaving the decision whether to overrule it to the General Assembly *as a matter of state policy*.

In the law the word "preference" denotes giving an advantage or priority to one or more claimants in a manner which discriminates unjustly or unreasonably against other claimants *in the same class*. This connotation of the term clearly was intended by section 40-3-106(1), for in the sentence immediately following the use of the term "preference" in that section, public utilities are forbidden to "establish or maintain any *unreasonable* difference as to rates . . . ."[1] If only *unreasonable* rate differentials are forbidden, it is plainly implied that *reasonable* differences in rates are not forbidden. It follows that a classification for rate purposes should not be considered a "preference" if the classification is reasonable.

This rationale is further buttressed by section 40-3-102, C.R.S. 1973, which empowers the P.U.C. "to prevent *unjust* discriminations . . . in the rates, charges and tariffs of . . . public utilities. . . . ." The clear implication is that *just* discrimination in rates may be tolerated.

Whether a particular classification among ratepayers is "unreasonable" or "unjust" is a question on which this court has no more expertise than the P.U.C. or the General Assembly. Indeed we probably have less. Such questions are at bottom fact issues, or at best mixed law-fact issues. They involve social policy determinations rather than legal decisionmaking.

The P.U.C. as a specialized, quasi-legislative agency is a particularly appropriate body to effectuate — at least in the first instance — the legislative factfinding and policymaking function incident to setting rates. It possesses unique expertise and the capacity to analyze the complex technical, economic, and social information necessary to set public utility rates intelligently and fairly. The constitution, as well as the statute governing P.U.C. rate regulation, wisely leave to the P.U.C. the initial authority to determine policy. *Colo. Const.*, Art. XXV; Section 40-3-101, C.R.S. 1973.

Moreover, section 40-3-106(1) expressly declares that, "[t]he commission has the power to determine any question of fact arising under this section." Generally, throughout our law, questions of what is *reasonable* or *unreasonable* are questions of fact. *Pomeroy v. Waitkus,* 183 Colo. 344, 517 P.2d 396 (1973) (negligence); *Middlesex Safe Deposit & Trust Co. v. Jacobs,* 87 Colo. 445, 290 P. 784 (1930) (reasonable time); *Colo. Postal Telegraph Co. v. City of Colo. Springs,* 61 Colo. 560, 158

---

[1] *"Advantages prohibited - graduated schedules.* (1) *No public utility,* as to rates, charges, service, or facilities, or in any other respect, *shall make or grant any preference* or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage. No public utility shall establish or maintain any *unreasonable difference as to rates,* charges, service, facilities, or in any respect, either between localities or as between any class of service. The *commission has* the *power to determine any question of fact* arising under this section." Section 40-3-106, C.R.S. 1973 (emphasis added).

P. 816 (1916) (reasonableness of fees for inspection); *Farrier v. Colo. Springs Rapid Transit Ry. Co.,* 42 Colo. 331, 95 P. 294 (1908) (negligence). Whether a particular classification of ratepayers is reasonable or not is essentially a fact question for the P.U.C. Appellate courts are, and ought to be, extremely reluctant to overrule findings of fact so long as they are based on evidence.

To summarize, it seems clear that the constitutional framers recognized that the factfinding and policy choices involved in utility ratemaking require highly concentrated analysis of complex, detailed factual and statistical information. Thus the constitution wisely left the initial policy aspects of ratemaking to the P.U.C. Of course, since the General Assembly is elected to represent the people in declaring the state's overall policy, the constitution recognized that the General Assembly may, by statute, overrule any policy adopted by the P.U.C. In my view the majority opinion has invaded this legislative function by, in effect, holding that the rate classification plan under attack creates an "unreasonable difference as to rates" or constitutes an "unjust discrimination" and therefore amounts to a "preference" forbidden by section 40-3-106(1). While the same result might well be reached by the General Assembly if it were to review the P.U.C.'s policy, that result is certainly not so clear that this Court, as a matter of law, should decide that the P.U.C. has created a "preference."

Although there is apparently no authority squarely in point, some light may be shed on the intent of the 1913 General Assembly in choosing the word "preference." In 1889, this Court decided *Bayles v. Kansas Pac. Ry. Co.,* 13 Colo. 181, 22 P. 341 (1889). That case dealt with the term "preference" in the ratemaking context. It was there asserted to be unlawful for a railroad to grant a particular shipper special freight rates lower than those generally charged. The issue was whether that practice, on its face, constituted a "preference" as the trial court had held, or whether the trial court had a duty to consider all the facts and circumstances which might render the discrimination in rates reasonable in the particular situation and therefore not a preference.

While acknowledging that the railroad clearly intended to give the appellant a "special rate," the Court noted that there had been no showing that others who brought themselves within the same class of shippers by shipping under "like circumstances and conditions" would not have been granted the same special rate.

Holding that there was no "unjust discrimination," and therefore that no "preference" had been granted, this Court declared:

"It is a well-settled elementary principle of the law of common carriers that mere inequality in charges does not amount to *unjust discrimination.* The requirement of the law is that the charge made shall be *reasonable.* A claim against a common carrier cannot be predicated upon the bare fact that the amount paid by one is greater than the amount

paid by another. At common law the question is whether, under all the circumstances, the charge is *reasonable*. Complete uniformity in charges is not obligatory. This principle prevails in all states, except where it has been modified by legislative enactment. In the administration of the law the principle itself has never been modified, but the courts have declared in many cases that there *must be no unjust discrimination*. This, too, has come to be an elementary principle. Charges, therefore, must not only be *reasonable, but equal, when the circumstances and conditions are the same*. Privileges tending to give a shipper a monopoly, which may injuriously affect those engaged in like pursuit, are declared to be *unjust*. Contracts which tend to create such *preferences* are held to be void as against public policy." 13 Colo. at 186-87, 22 P. at 342 (emphasis added).

The similarity between the language in the 1889 *Bayles* opinion and that in the 1913 statutory scheme adopting the term "preference" is indeed striking. Even more striking is the disimilarity between the meanings accorded the same words in the 1889 opinion and in today's majority opinion.

Other state courts have followed the *Bayles* reasoning that only *unreasonable* classifications of customers resulting in *unreasonable* differences in rates are forbidden as "preferences." *Columbia Gas of N.Y. v. N.Y. Elec. & Gas Corp., supra; Curtiss-Wright Corp. v. Passaic Valley Water Comm'n,* 84 N.J. Super. 197, 201 A.2d 398 (1964). Discrimination *per se* need not be eliminated; only *unjust* discrimination is prohibited.

Seen in the light of the *Bayles* rationale, the bottom line issue here is whether according a special gas rate to a class comprised of elderly poor and disabled poor customers constitutes *unreasonable* classification or *unjust* discrimination as a matter of law. Surely it does not.

Our state law is replete with instances where the legislature or quasi-legislative bodies spend state funds to benefit classes comprised of the aged, disabled or poor regardless of the cost or value of the services provided. For example, the Colorado Public Assistance Act provides payments and other social services to old age pensioners and the needy disabled. Section 26-2-101, *et seq.,* C.R.S. 1973 (1977) Supp.). Medical and remedial care is provided at state expense for "individuals whose income and resources are insufficient to meet the costs" of such care. Section 26-4-101, *et seq.,* C.R.S. 1973 (1977 Supp.). Indigent persons are assured legal representation paid for by the state in serious criminal cases. Section 21-1-103, C.R.S. 1973 (and this practice was being followed to a lesser extent even before it was required by *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)). State university and college scholarship programs give preference to students from low-income families. Special classes in the public school system are provided for the handicapped and special state care facilities are available for those disabled by mental

retardation or brain injury. Aid to dependent children of low-income parents is commonplace. A Denver resident, disabled or 65 years of age or older, is entitled to a tax rebate depending on income level and the amount paid in property taxes or rent. Similar examples of classifications based on factors like those applied here by the P.U.C. could be multiplied indefinitely.

Nor can this Court declare that such a classification scheme is unreasonable as a matter of law. High costs of utility service may effectively result in total denial of gas service to customers who cannot afford those high rates. Such a denial of natural gas service in the homes of elderly and disabled poor persons would have a serious, adverse impact on the health, safety and comfort of that class of customers to whom the P.U.C. proposes to offer special, lower rates.[2] The General Assembly may well conclude that these factors justify the P.U.C.'s consideration of ability to pay in setting rates. Such a classification of consumers is not *per se* unreasonable nor arbitrary and therefore does not necessarily create a preference prohibited by the statute.

It is not for this Court, but for the P.U.C., and ultimately the General Assembly, to decide whether to grant special utility rates to the classes of citizens here involved. Absent a showing that the classification plan adopted by the P.U.C. is unreasonable or amounts to unjust discrimination, this Court should not interfere.

---

[2] *See, e.g., E. Lane, Elderly Exposed to Fatal Risks in Hypothermia, The Denver Post,* Fr., Jan. 12, 1979, p. 31:

"The cold temperatures of winter can pose health problems for us all, but the *elderly are most vulnerable.* For them, even a modest drop of room temperature , if prolonged, can trigger an abnormal lowering of body temperature known as accidental hypothermia.

"The *condition can be fatal* if not properly diagnosed and treated. A person whose deep body temperature falls below 95 degrees Fahrenheit is considered to be hypothermic (normal body temperature is 98.6). Such lowered body temperatures can occur even when room temperatures are between 60 and 65 degree, according to Dr. Richard Besdine, a Boston specialist in medical care of the aged.
* * * *

"In addition to such temperature control problems, there are other factors, both medical and social, which may make a person susceptible to hypothermia. According to the National Institute on Aging, these factors can include:
* * * *

" — Low income and few savings. For those unable to afford fuel, maintaining a room temperature of 70 degrees may be a luxury that must be sacrificed in order to buy food.

" — Substandard, inadequately insulated housing. It has been estimated that 30 percent of older Americans live in substandard housing." (Emphasis added.)