CITIZENS ACTION COALITION OF INDIANA, INC., Appellant (Intervenor Below),

v.

PUBLIC SERVICE COMPANY OF INDIANA, Northern Indiana Public Service Company, Indiana & Michigan Electric Company, Southern Indiana Gas & Electric Company, Indianapolis Power & Light Company, Richmond Power & Light, Indiana Retail Council, the Public, American Cyanamid Company, Jones & Laughlin Steel Corporation, National Steel Corporation, Midwest Steel Division, International Harvester Company, Inland Steel Company, Union Carbide Corporation, Eli Lilly and Company, General Motors Corporation, Bethlehem Steel Corporation, City of Fort Wayne, Indiana, U.S. Steel, Appellees (Respondents and Intervenors Below).

No. 2-582A142.

Court of Appeals of Indiana, Fourth District.

June 20, 1983.
Rehearing Denied July 21, 1983.

**100**

Jay Lauer, Legal Services Program of Northern Ind., Inc., South Bend, for appellant.

Fred E. Schlegel, Michael J. Huston, Mary M. Stanley, Baker & Daniels, Jerry P. Belknap, John J. Metts, Barnes & Thornburg, Indianapolis, for appellees.

YOUNG, Presiding Judge.

Appellant Citizens Action Coalition, Inc. (CAC) appeals from an order of the Public Service Commission of Indiana declining to require Indiana electric utilities to offer "lifeline" rates to their customers. Lifeline rates would provide residential customers an amount of electricity deemed necessary to meet their "essential needs" at a price below the actual cost of providing the electric service. The Commission found that a "targeted" lifeline rate, which would provide a below-cost electric rate to specific income or demographic groups of residential customers for their essential needs, is prohibited by law. The Commission also found that a "general" lifeline rate structure, which would provide a below-cost rate to all residential customers for their essential needs, is not an effective and equitable means of providing assistance to low-in-

come residential customers and should not be required.

This case arose under the Public Utility Regulatory Policies Act (PURPA), 16 U.S.C.A. §§ 2601–45 (Supp.1982), enacted by Congress in 1978. Under PURPA, all state utility regulatory agencies were required to consider, and adopt or reject, various rate design and service standards for electric utility service, set out in §§ 111–15 of PURPA. 16 U.S.C.A. §§ 2621–25 (Supp. 1982). Section 111(d)(1) of PURPA, 16 U.S.C.A. § 2621(d)(1) (Supp.1982), provides that generally "[r]ates charged by any electric utility for providing electric service to each class of electric consumers shall be designed, to the maximum extent practicable, to reflect the costs of providing electric service to such class . . . ."[1] Section 114, 16 U.S.C.A. § 2624 (Supp.1982), however, mandated state utility regulatory agencies to conduct evidentiary hearings to determine the desirability of adopting rate structures which would provide residential customers with enough electricity to meet their essential needs at a rate below the cost of providing the electric service, i.e., lifeline rate structures. To comply with the congressional mandate, the Commission held a generic hearing to consider the propriety of implementing lifeline rates. The proceeding, which included all affected electric utilities and a large number of intervenors, was to consider two issues:

1. The definition of "essential needs;"[2] and

2. The desirability of fixing, approving, or allowing to go into effect a rate for "essential needs" of residential electric customers, which is lower than a rate under the standard referred to by § 111(d)(1) (16 U.S.C.A. § 2621(d)(1) (Supp.1982)) of PURPA.

After the hearing, the Commission issued its order rejecting the implementation of

---

1. The Commission held separate hearings for each electric utility with respect to the PURPA § 111(d) standards. No party sought judicial review of any Commission decision or order in any of those proceedings.

2. Although there was a dispute before the Commission as to what constituted "essential needs," none of the parties challenge on appeal the definition of essential needs adopted by the Commission.

lifeline rates. CAC appeals from this order raising the following issues: [3]

1. Whether Ind.Code 8–1–2–103 prohibits a targeted lifeline rate structure; and

2. Whether the Public Service Commission's decision not to adopt a general lifeline rate structure is supported by adequate findings of fact based on substantial evidence.

■ CAC first challenges the Commission's conclusion that a targeted lifeline rate is prohibited by Ind.Code 8–1–2–103. That section forbids a public utility from charging any customer "a greater or less compensation for any service . . . than it charges . . . any other person for a like and contemporaneous service." CAC contends that Ind.Code 8–1–2–103 must be read with Ind.Code 8–1–2–68, which prohibits rates that are "unjust, unreasonable, insufficient or unjustly discriminatory, or . . . preferential or otherwise in violation of any of the provisions of this act . . . ." CAC argues that, when read together, these statutes do not prohibit rate discrimination as long as it is not "unjust" or "unreasonable." CAC's reading of these statutes is untenable. Ind. Code 8–1–2–68 permits reasonable differences in rates; that is, it allows different rates to be charged "for service rendered under different conditions and under different circumstances." *Capital Improvement Board v. Public Service Commission*, (1978) 176 Ind.App. 240, 264, 375 N.E.2d 616, 633. At the same time, however, it prohibits discriminatory rates which are in violation of other provisions of the Public Service Commission Act, including Ind.Code 8–1–2–103. Ind.Code 8–1–2–103 prohibits charging different rates for the same services under the same conditions. Thus, even when read together, the statutes prohibit charging different rates for "like and contemporaneous service." A targeted lifeline rate structure does precisely that. It charges customers receiving the same service under the same circumstances different rates. This violates Ind.Code 8–1–2–103. It does not matter that the group receiving the preferential rates is deserving. The statute prohibits such discrimination.

In *Mountain States Legal Foundation v. Public Utilities Commission*, (1979) 197 Colo. 56, 590 P.2d 495, the Colorado Supreme Court held targeted lifeline rates were discriminatory and unjustly preferential. The court stated:

Section 40–3–106(1), C.R.S.1973, prohibits public utilities from granting preferential rates to any person, and section 40–3–102, C.R.S.1973, requires the PUC to prevent unjust discriminatory rates. When the PUC ordered the utility companies to provide a lower rate to selected customers unrelated to the cost or type of the service provided, it violated section 40–3–106(1)'s prohibition against preferential rates. In this instance, the discount rate benefits an unquestionably deserving group, the low-income elderly and the low-income disabled. This, unfortunately, does not make the rate less preferential. To find otherwise would empower the PUC, an appointed, nonelected body, to create a special rate for any group it determined to be deserving. The legislature clearly provided against such discretionary power when it prohibited public utilities from granting "any preference." In addition, section 40–3–102, C.R.S.1973, directs the PUC to prevent unjust discriminatory rates. Establishing a discount gas rate plan which differentiates between economically needy individuals who receive the same service is unjustly discriminatory.

*Id.* at 59–60, 590 P.2d at 498. We agree with the appellees that those observations are applicable here. The Commission correctly concluded Ind.Code 8–1–2–103 forbids a targeted lifeline rate structure.

■ CAC next contends the Commission's decision not to adopt a general lifeline rate structure is not supported by adequate findings of fact based on substantial evidence. Pursuant to Ind.Code 8–1–3–1, we use a two-tier standard of review. At the first level, we determine whether the

---

**3.** The issues have been renumbered and restated for clarity.

Commission's decision contains specific findings on all the factual determinations material to its ultimate conclusions. *Office of Public Counsellor v. Indiana & Michigan Electric Co.,* (1981) Ind.App., 416 N.E.2d 161, 164. "This first level may be termed a 'question of law' as we ask whether the [Commission's] ultimate conclusions may be 'reasonably' inferred from its finding of basic facts." *Id.* The second level of review requires this court to inquire whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. *Id.* "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *L.S. Ayres & Co. v. Indianapolis Power & Light Co.,* (1976) 169 Ind.App. 652, 663–64, 351 N.E.2d 814, 823 (quoting *Consolidated Edison Co. v. NLRB,* (1938) 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126).

■ CAC first argues the Commission failed to make any finding on the issue of whether a lifeline rate structure was more equitable than the current declining block rate structure.[4] CAC contends their proposal was a "cost-based" lifeline rate which would be more equitable than the current rate structure. The language of § 114 of PURPA requires the Commission to consider the desirability of instituting rates which are *lower* than cost-based rates. 16 U.S.C.A. § 2624 (Supp.1982). Thus, lifeline rates are, by definition, lower than cost-based rates. The term "cost-based lifeline rates" is contradictory as it relates to PURPA requirements. The issue before the Commission was not whether another cost-based rate structure was more equitable than the current rate structure, but rather whether below-cost lifeline rates were desirable. If CAC wanted to challenge the equity of the current declining block rate structure, they should have challenged those rates during the PURPA § 111(d)

standards hearings. *See* 16 U.S.C.A. § 2621(d)(1) and (2) (Supp.1982). The Commission did not err in not making a finding concerning the equity of the current rate structure as compared to a "cost-based lifeline rate" structure.

■ CAC also challenges the Commission's findings on the merits of a general lifeline rate. One of the justifications advanced for a general lifeline rate structure is that it is an effective and equitable means of providing assistance to low-income residential electricity consumers. It is agreed that the equity and efficiency of a general lifeline rate structure as an aid to the needy depends in part upon the degree to which the consumption of electricity is related to the level of income. If low-income customers use low amounts of electricity and high-income customers use large amounts of electricity, a general lifeline rate structure would be an equitable method of providing assistance to the needy. The Commission found a "positive, but only moderate, correlation exists between level of income and consumption of electricity." The Commission concluded that, although a general lifeline rate structure would benefit low-income consumers who are low users of electricity, it would have the undesirable effects of benefiting many middle and high-income consumers who are low users of electricity and harming a number of low-income consumers who are high users of electricity. Thus, the Commission concluded a general lifeline rate is not an effective and equitable means of providing assistance to needy residential electricity customers. CAC contends the Commission's finding of only a moderate correlation between level of income and consumption of electricity is not supported by substantial evidence, and that the correlation is in fact a significant one. The testimony before the Commission indicated there was a moderate class correlation between income and consumption of

---

4. Declining block rates apply lower unit costs to volumes in the later block or blocks of a rate schedule. These rates generally reflect the recovery in the first rate block of fixed costs which are unrelated to consumption, such as customer billing, accounting and meter reading. The later blocks are reduced so as to not permit double recovery of these costs and to reflect other cost savings associated with larger consumption.

electricity. Within a given income class, however, the range of consumption was quite wide. One study indicated that twenty percent of families with incomes less than $7500 per year have above average energy consumption, while twenty-five percent of families with incomes over $25,000 per year have below average energy consumption. Another study indicated that under a general lifeline rate structure twenty-six percent of low-income families would pay higher electricity bills and forty-nine percent of high-income families would pay lower electricity bills. Further testimony established that family size and size and age of the house have a greater effect on electricity consumption than income does. Considering all these facts, there was substantial evidence to support the Commission's finding. The Commission did not err in finding only a moderate correlation between income and electricity consumption.

■ CAC next attacks the Commission's conclusion that a direct assistance program would be more effective and equitable than lifeline rates in assisting the needy. There was testimony that a direct assistance program has advantages over a general lifeline rate structure. Under a direct assistance program, assistance can be targeted to those most in need of assistance, while avoiding the subsidization of high-income families. Under a lifeline rate structure, the benefits are spread over all residential customers, resulting in meager savings to low-income families. The benefits under a direct assistance program would be better focused and, consequently, much more significant. Although not disputing these facts, CAC contends that Indiana's direct assistance program, Project S.A.F.E., reaches only about fifty percent of the poor. There is substantial evidence if a reasonable mind might accept all relevant evidence as adequate to support a conclusion. *L.S. Ayres & Co. v. Indianapolis Power & Light Co.,* (1976) 169 Ind.App. 652, 351 N.E.2d 814. Thus, a party attacking a finding of the Commission cannot merely point out evidence in the record more favorable to their position. *Bethlehem Steel Corp. v. Northern Indiana Public Service Co.,* (1979) Ind. App., 397 N.E.2d 623. From the evidence presented, a reasonable mind could conclude that a program of direct assistance is more effective and equitable than lifeline rates in providing help to the needy. We will not substitute our judgment for that of the Commission. *Id.*

■ CAC next argues the Commission's finding that a general lifeline rate structure would give false price signals to consumers is not supported by substantial evidence. CAC contends a cost-based lifeline rate structure would give a more realistic price signal to consumers than the current declining block rate structure. As we noted earlier, the Commission was not considering cost-based lifeline rates. The Commission was considering rates which are lower than cost-based rates. *See* 16 U.S.C.A. § 2624 (Supp.1982). It was clearly established that below-cost rates created economic inefficiencies by distorting price signals. The Commission's decision was based upon substantial evidence.

■ The Commission stated in its decision that assistance for low-income customers should be left to the legislature. CAC attacks this statement as unsupported by substantial evidence. The Commission's rate-making power is legislative, and in designing rates the Commission may consider factors other than the cost of service. Thus, as CAC contends, the Commission had the power to implement general lifeline rates. Before it stated that the problem was one for the legislature, the Commission determined that lifeline rates were not an equitable and effective method of assisting the needy. The Commission understood it had the power to implement lifeline rates, but found that doing so was not consonant with good regulatory policies. By stating it was a legislative problem the Commission was merely indicating that any decision to implement an assistance program not based on sound regulatory principles must be made by the legislature. The Commission's finding is not erroneous.

■ The other major justification advanced for a general lifeline rate structure is that it would promote conservation. The Commission found the evidence insufficient to make a determination as to the effect a

general lifeline rate structure would have on conservation. CAC contends there was sufficient evidence in the record to justify lifeline rates based on conservation. Several expert witnesses, however, testified that lifeline rates would promote energy consumption and not conservation. Louis Jahn explained his reasons for this conclusion as follows:

The argument that an inverted residential rate design will promote conservation is based upon the premise that electric usage is more sensitive to the marginal rate than the average rate, i.e., that customer usage is more sensitive to the blocks in the tariff than the total bill. The problem with an inverted lifeline rate design is that it may in fact result in increased consumption. This can occur if the average customer receives a lower monthly bill because of the inversion in the rate and responds, in turn, by increasing his consumption.

The Commission could have found this analysis persuasive. Jahn's and the other experts' testimony was sufficient to permit the Commission to determine lifeline rates could not be justified on the basis of conservation. There was substantial evidence to support the Commission's finding.

Affirmed.

MILLER and CONOVER, JJ., concur.