CF&I STEEL, L.P.; and Cyprus Climax Metals Company, Petitioners–Appellants,

v.

The PUBLIC UTILITIES COMMISSION OF THE STATE OF COLORADO; Robert J. Hix, Vincent Majkowski and Christine E.M. Alvarez, Commissioners thereof, individually in their official capacity, Respondents–Appellees.

No. 96SA410.

Supreme Court of Colorado, En Banc.

Dec. 22, 1997.

Dufford & Brown, P.C., Richard L. Fanyo, Lisa A. Lee, Denver, for Petitioners–Appellants.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Linda L. Siderius, Deputy Attorney General, Richard Djokic, First Assistant Attorney General, Eugene C. Cavaliere, Senior Assistant Attorney General, Regulatory Law Section, Denver, for Respondents–Appellees.

Justice HOBBS delivered the Opinion of the Court.

This appeal, taken directly to us under section 40–6–115(5), 11 C.R.S. (1997), is from a district court order upholding a rate setting decision of the Colorado Public Utilities Commission (PUC). At issue is only one aspect of the PUC's decision, the electrical rates that Public Service Company of Colorado (PSCo) charges to large commercial and industrial customers who elect to receive interruptible rather than firm service to meet part or all of their electricity requirements. Appellants, CF&I Steel (CF&I) and Cyprus Climax Metals Company (Cyprus), contend that the interruptible service rates which the PUC set are unreasonable, unjust, an abuse of discretion, and not supported by substantial evidence in the record, primarily because these rates do not match the cost of providing electrical service to the interruptible customers and, instead, act unreasonably to lower the cost of service to firm customers at the expense of the interruptible customers.[1]

1. The appellants present the following issues on appeal:

Upon reviewing the record and considering the issues raised, we affirm the district court's order upholding the PUC's decision.

## I.

In 1994, PSCo submitted its rate design and cost allocation proposals to the PUC in Phase II of a comprehensive rate setting proceeding. Originally, this proceeding involved rates for gas, steam, and electric service. As a result of settlement, only the electric service issues were tried to the PUC. In Phase I of its rate proceeding, the PUC reviewed PSCo's proposed revenue requirement of $1,115,793,901, calculated to include its proposed 9.4% rate of return. In Phase II, the PUC spread the approved revenue requirement among PSCo customers by setting rates for the different classes of electric service. At issue here are the rates adopted for interruptible service.

Interruptible service is available only to large commercial and industrial consumers who agree under certain conditions to have their electric service curtailed when PSCo is unable to meet the demands of all customers. A customer must have at least 500 kilowatts of demand to be eligible for this category of service. Because these customers have agreed to be curtailed during peak demand periods, they are billed a substantially reduced amount for their electric service in comparison to charges they would incur for non-interruptible, or firm, service.

1. Whether the above-cost demand rates set by the PUC for interruptible electric service are unjust, unreasonable, and an abuse of discretion in violation of § 40–3–101(1), 17 C.R.S. (1993 Repl.Vol.), because they deny interruptible customers' right to pay rates which accurately reflect the cost of providing interruptible service as determined by the PUC.
2. Whether the PUC's decision to set interruptible demand rates above the cost of service determined by the PUC is supported by substantial evidence in the administrative record.
3. Whether interruptible customers, including CF & I and Cyprus, are entitled to a refund of the amount by which the interruptible demand rates they are paying exceed the cost of providing interruptible service as determined by the PUC.

2. The PUC's integrated resource planning regulation, 4 C.C.R. 723–21, contains the following basis and purpose:

PSCo's power supply is largely generated by base load coalfired generation units, and is supplemented by a small amount of gasfired peaking generation units and purchases of electricity from other suppliers. In the first part of this decade, PSCo and the PUC began to engage in an integrated resource planning process as the result of a 1991 order of the PUC approving a settlement among multiple parties, see 126 Public Utilities Reports 9 (4th ed.1991), and the PUC's integrated resource planning regulation, see 4 C.C.R. 723–21.[2]

Traditional utility regulation has focused on adjusting the prices that electric utilities can charge; integrated resource planning adds to decisionmaking the dimension of the efficient use of electricity and the resources used to produce it. See Scott F. Bertschi, Comment, *Integrated Resource Planning and Demand–Side Management in Electric Utility Regulation: Public Utility Panacea or a Waste of Energy?*, 43 Emory L.J. 815, 815 (1994). The term "integrated resource planning" refers to a "set of regulations designed to ensure that electricity is produced and used in the most efficient way." *Id.*

As part of its integrated resource plan, PSCo identified interruptible service not only as a competitive means for attracting, holding, and serving large customers, but also as a resource to be evaluated and employed along with other resources in reducing demand[3] or adding supply.[4] PSCo has approx-

This process is intended to benefit the people of Colorado by assuring that Commission jurisdictional electric utilities balance the following interests when planning to meet the current and future electricity needs of the state: 1) the attainment of fair, reasonable and low prices for electricity; 2) the preservation of adequate and reliable electric service; 3) the protection of public health and safety; 4) the preservation of environmental quality and sustainability; 5) the management of risks attributable to electric resource acquisition; 6) the development of diversified electric resource portfolios; 7) the impact of utility decision-making on Colorado and local economies; and 8) the maintenance of utility financial integrity.

3. Demand side resources are those which focus on reducing consumption, and include the assessment of "underutilized opportunities to increase the efficiency of energy service delivery." See Evan van Hook, Note, *Conservation Through*

imately fifty commercial and industrial interruptible accounts for a current total of 158 megawatts of what it characterizes as "interruptible rate resource," with CF&I's allocation consisting of 100 megawatts. PSCo plans to have 200 megawatts of interruptible rate resource by the year 2004.

PSCo's Manager of the Industrial and Affiliates Marketing Unit, Kent M. Schuler, testified that the interruptible rate resource can be valued by estimating the cost the company might be required to invest in additional capacity to meet peak power requirements. PSCo proposed to credit the interruptible customers with the projected avoided costs of adding another gas turbine unit to its existing Valmont plant. PSCo valued this interruptible resource credit at $9,167,688. Since it would take PSCo approximately five to six years to bring a new combustion turbine on-line, the length of proposed contracts for interruptible service would be for a comparable time period.

PSCo had offered a form of interruptible service for large customers as a load management tool since 1973 but discovered, as described by Schuler, that its "without notice" interruption classification—which allowed PSCo to interrupt a customer's service an unlimited number of times and without prior notice—did not hold sufficient attraction for some of its large load commercial and industrial customers that sought "greater value in the form of customized choices, better service, and a range of price options."

Accordingly, the company developed and proposed to the PUC in this proceeding a "menu of interruptible service options" and a "different interruptible costing methodology for this rate case." These new service options offered a variety of limitations on the large customer's interruptibility, including the requirement of a thirty minute advance notice prior to the start of an interruption, a limitation on the number of curtailments annually, a limitation on the hourly duration of each curtailment, or a combination of the

above. Each such limitation reduces the value of the interruptible service to PSCo and its overall customer base as a demand side resource. Thus, PSCo proposed a more attractive rate for the no notice interruption option, with the differential between firm and interruptible rates reduced in gradations according to the limitations on interruptibility chosen by the customer.

At the hearing, the PUC heard testimony from a wide spectrum of interested parties, including CF&I and Cyprus. CF & I purchases electricity from PSCo for use in its steel manufacturing facility in Pueblo, and Cyprus for use in two molybdenum mines located near Leadville and Empire. Both companies purchase a combination of firm and interruptible electric service. CF&I and Cyprus suggested several modifications to PSCo's rate proposal and questioned the company's characterization of interruptible service as a "resource" instead of a "lower value service". However, they agreed with PSCo's basic proposal to essentially assign 100% of the avoided gas turbine costs to the interruptible accounts in the form of a discount from firm rates.

In modifying the PSCo proposal, the PUC paid particular attention to the testimony of witnesses called by two public interest organizations. Gretchen McClain, a Research Associate with the Tellus Institute, testified on behalf of the Office of Energy Conservation (OEC). She suggested that the method proposed by PSCo for calculating interruptible rates should be abandoned in favor of a bidding process, which would allow the market value of interruptible service to determine the appropriate rate. In support of this proposal, she emphasized the relatively low risk that an interruption would be necessary in any given year, and predicted that PSCo's proposed rates would provide a windfall to large commercial and industrial customers to the detriment of all other PSCo customers. McClain testified that

---

*Cooperation: The Collaborative Planning Process for Utility Conservation and Load Management,* 102 Yale L.J. 1235, 1237 n. 12 (1993).

4. Supply side resources are typically acquired through capacity expansion, *id.* at 1238, which involves the increased consumption of natural resources such as coal, oil, or natural gas, or use of renewable resources such as water, solar, or wind energy.

"the Company is likely paying too much for interruptibility.... [A] well-designed bidding program could reduce the cost of interruptibility." She provided an exhibit demonstrating the number of interruptions which had actually occurred for capacity-related reasons over the course of eleven years [5] and testified that only eight percent of total interruption hours over the study period were capacity-related.[6]

Under the OEC proposal, qualified interruptible customers would bid for interruptible service. McClain said that an auction conducted for the Pacific Gas & Electric Company in California suggested that such a bidding process could lower the cost of "acquiring" this resource. On the other hand, failure to utilize such a mechanism would be "unfair" to all of PSCo's ratepayers because they would not be obtaining interruptible service "at fair market prices." Furthermore, if PSCo needed a supply side resource, such as an additional combustion turbine, it should be expected to select the vendor who offered the unit at the lowest cost in open competition between suppliers. In contrast, noted McClain, the use of avoided costs as a proxy for calculating the price advantage given to the interruptible customers could represent an inflated estimate because "competition is completely absent in PSCo's approach to the acquisition of interruptible supply."

Dr. Ben Johnson, a Consulting Economist with Ben Johnson Associates testifying on behalf of the Office of Consumer Counsel (OCC), suggested that the interruptible rate price advantage be reduced to 80% of the adjusted avoided gas turbine cost. Dr. Johnson offered three reasons for the OCC proposal. First, he stated that "if the cost savings [of the avoided capacity] are overestimated to the slightest degree, other customers will tend to be adversely affected by the interruptible rate discount." Second, he asserted that the PSCo proposal was inconsistent with the result one would normally expect from an arms length negotiation. Under the PSCo proposal, all of the benefits of the avoided cost would flow to the interruptible customers and none to the company and its other customers. Finally, Dr. Johnson noted that interruptible service is not an option for all PSCo customers, but only for a relatively few large commercial and industrial accounts.

In its response, Cyprus introduced the testimony of Dennis R. Eicher, the Vice–President of Power System Engineering. Eicher opined that the OCC's proposal would result in the subsidization of other classes of service and operate in derogation of the principle that "cost causers should be cost payers." OEC's proposed bidding program would be "too inflexible to fit into the corporate planning objectives of industrial customers" and interruptible customers "should be treated as customers not vendors." CF & I agreed with this argument, and, through its cross-examination of McClain, questioned the viability of a bidding process because no real market could exist when PSCo was the only "buyer" of what the interruptible customers had to "sell."

In its decision, the PUC declined to adopt the OEC's recommended bidding system but accepted the OCC suggestion that PSCo's interruptible rate proposal be modified to reflect 80% of the adjusted avoided capacity cost. The PUC found this proposal to "provide[ ] a practical middle ground to the bidding process advocated by the OEC and the proxy methodology advanced by the Company." But the PUC also provided interrupti-

---

5. The capacity-related interruptions for the years 1983 through 1993 were summarized in this exhibit as follows:

| | |
|---|---|
| 1983 | 0 |
| 1984 | 0 |
| 1985 | 1 |
| 1986 | 4 |
| 1987 | 2 |
| 1988 | 3 |
| 1989 | 0 |
| 1990 | 0 |
| 1991 | 0 |
| 1992 | 0 |
| 1993 | 0 |

6. The remaining hours were attributed to economic interruptions, whereby the company could curtail service when its energy costs exceed the revenue it would receive from providing service to the interruptible customer. PSCo proposed to eliminate economic interruptions in this proceeding due to their unpopularity, but the PUC directed the company to retain this option on a voluntary basis.

ble customers with an opportunity to recoup the remaining 20% of the avoided capacity cost through a graduated credit for each interruption that actually occurred during the billing year. Under this rate design, an interruptible customer that incurs ten interruptions a year is allocated a 100% share of the avoided capacity cost.

PSCo and several intervenors filed applications with the PUC for rehearing, reargument, and reconsideration, requesting that the Commission follow PSCo's recommendation, delete the earn back provision, and reflect 100% of the estimated avoided capacity cost in the basic interruptible rates. The PUC issued its rehearing decision affirming its prior written decision with modifications, this time emphasizing that the OCC's proposed approach was a "prudent and cautious adjustment to ensure that other rate payers are protected from paying interruptible customers too much for this 'resource.'" The PUC further explained that "the 80/20 split [is] a reasonable response to the lack of 'risk' of interruption experienced by interruptible customers on the Public Service system." The PUC stated that its intent in adopting the earn back mechanism for the 20% credit was to "direct this portion of the avoided cost credit to those customers who are actually interrupted."

CF&I and Cyprus then petitioned the district court for certiorari review of the PUC decision, pursuant to section 40–6–115, 11 C.R.S. (1997).[7] They argued that the rates set by the PUC constituted a subsidy for firm customers of approximately 1.3 million dollars and were unjust, unreasonable, and an abuse of discretion because they did not reflect the cost of providing interruptible ser-

vice, contrary to Colorado law. They further argued that the decision was not supported by substantial evidence in the record. The district court disagreed, finding that the testimony of the OCC and the OEC provided substantial evidence for the PUC's decision and concluding that "the rate determined as a result of this evidence was fair, just, and reasonable."

CF&I and Cyprus then brought this appeal pursuant to section 40–6–115(5), 11 C.R.S. (1997). They request that we set aside the adopted interruptible rates and issue an order requiring the Commission to implement the PSCo proposal.[8] They also ask that we direct PSCo to refund payment of all amounts that have been collected in excess of the interruptible rates which the company recommended to the PUC in the hearing. PSCo supports the CF&I and Cyprus position, but opposes the refund request.

## II.

We hold that CF&I and Cyprus have failed to sustain their burden of proving that the rates set by the PUC as a result of this proceeding are unreasonable or unjust. We further hold that the findings and decision of the PUC are supported by substantial evidence in the record and that the Commission did not abuse its discretion in utilizing the 80/20 avoided capacity cost split in setting the rates for interruptible service.

### A.

#### Standard of Review

■ Colorado law vests in the three member PUC the authority to regulate rates

---

7. Section 40–6–115 provides:

(1) Within thirty days after a final decision by the commission in any proceeding, any party to the proceeding before the commission may apply to the district court for a writ of certiorari or review for the purpose of having the lawfulness of the final decision inquired into and determined.... No new or additional evidence may be introduced in the district court, but the cause shall be heard on the record of the commission as certified by it. The commission and each party to the action or proceeding before the commission shall have the right to appear in the review proceedings.

....

(3) Upon review, the district court shall enter judgment either affirming, setting aside, or modifying the decision of the commission. So far as necessary to the decision and where presented, the district court shall decide all relevant questions of law and interpret all relevant constitutional and statutory provisions.

8. In their brief, CF&I and Cyprus state that they do not contest the PUC's use of a "resource valuation" approach but, rather, its decision to deduct only 80% of the avoided capacity cost from firm rates. They argue that the PUC acted on a "vague perception of the market price of interruptible service in a market which does not exist."

charged by public utilities for service in this state. *See,* Colorado Constitution, art. XXV; § 40–3–102, 11 C.R.S. (1997). This power is legislative in nature. *See Mountain States Tel. & Tel. Co. v. Public Utils. Comm'n,* 195 Colo. 130, 135, 576 P.2d 544, 547 (1978).[9] *See also Public Utils. Comm'n v. Northwest Water Corp.,* 168 Colo. 154, 167, 451 P.2d 266, 273 (1969) ("[T]he legislature clearly intended to place the primary duty and responsibility for the determination of just and reasonable utility rates in the Commission, and provided a rather complete procedural structure for the Commission to follow in discharging its function.").

Under section 40–3–101, 11 C.R.S. (1997), "[a]ll charges made, demanded, or received by any public utility for any rate, fare, product, or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable." The PUC has the duty to examine proposed rates, and to determine whether the tolls, fares, rentals, charges, or classifications for service are unjust, unreasonable, discriminatory, or preferential, or in any way violate any provision of law, and if so, to set just and reasonable rates. *See* § 40–3–111(1), 11 C.R.S. (1997).

The PUC's regulatory powers and duties are aimed primarily at the protection of consumers who have little or no choice in the selection of their provider because the utility enjoys monopoly status. Under the prevailing norms of utility regulation, rates are to be set at a level that covers the utility's legitimate costs and expenses in providing service to the public and a reasonable rate of return on its investment. Accordingly, the primary matters for PUC determination in the public interest are: (1) sufficiency of the rates to recompense the utility and maintain its operational viability for the purpose of serving the public; and (2) distribution of the revenue requirement between the various customer classes in a just and reasonable manner.

Since rate setting is a legislative function which involves many questions of judgment and discretion, courts will not set aside the rate methodologies chosen by the PUC unless they are inherently unsound. The Commission is not bound by a previously utilized methodology when it has a reasonable basis, in the exercise of its legislative function, to adopt a different one. *See Bennett Bear Creek Farm Water Dist. v. City & County of Denver,* 928 P.2d 1254, 1268 (Colo. 1996).

Although consumers within the same class of service should be subject to substantially similar rates, the PUC may establish different classifications of service, and different rates for each class, based upon reasoned distinctions. Classifications that neither impinge on fundamental rights nor affect suspect classes are not unlawfully discriminatory unless they do not have a rational relationship to a legitimate governmental purpose in the context of utility regulation. *See id.*

Judicial review of a PUC decision is by certiorari petition to the district court within thirty days of a final decision in any proceeding. *See* § 40–6–115(1), 11 C.R.S. (1997). Because the PUC is an expert Commission with fact finding and policy making authority, the exercise of which is informed by evidence and arguments presented on the record in the proceeding, judicial review of a PUC rate decision is relatively narrow. *See City of Montrose v. Public Utils. Comm'n,* 629 P.2d 619, 622 (Colo.1981). Section 40–6–115(3), 11 C.R.S. (1997), states that:

> The [district court's] review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence.

**9.** Recently, in *U.S. West Communications, Inc. v. City of Longmont,* 948 P.2d 509, 517 (Colo.1997), we again recognized that ratemaking is a legislative type function, although we held there that a filed tariff does not rise to the level of a state statute when analyzing an alleged conflict between a tariff and a municipal ordinance. *Id.* at 518.

■ Review on appeal to this court from the district court focuses on three concerns: "whether the Commission has regularly pursued its authority; whether its decision is just and reasonable; and whether the decision is supported by substantial evidence in the record viewed as whole." *Colorado Office of Consumer Counsel v. Public Utils. Comm'n,* 786 P.2d 1086, 1091 (Colo.1990). The PUC proceeds within the framework of the constitution, the PUC enabling statute and regulations, and applicable federal statutes and regulations. Generally, we defer to the PUC's interpretation of its own decisions and regulations, *see Westway Freight, Inc. v. Public Utils. Comm'n,* 156 Colo. 508, 512, 400 P.2d 444, 446 (1965), but we will set aside actions or interpretations that are clearly erroneous, arbitrary, in excess of the PUC's authority, or not in accordance with the law. *See Sangre De Cristo Elec. Assoc., Inc. v. Public Utils. Comm'n,* 185 Colo. 321, 325, 524 P.2d 309, 311 (1974).

We have said that " 'in a question of rate-making there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing.' " *Northwest Water Corp.,* 168 Colo. at 172, 451 P.2d at 275 (quoting *Darnell v. Edwards,* 244 U.S. 564, 569, 37 S.Ct. 701, 703, 61 L.Ed. 1317 (1917)). *See also Colorado–Ute Elec. v. Public Utils. Comm'n,* 760 P.2d 627, 640 (Colo.1988)("We have long held that the factual determinations of an administrative body such as the PUC are entitled to considerable deference.").

■ The judiciary must refrain from any semblance of rate setting in deference to the lawfully empowered authority, here the PUC. *See Public Utils. Comm'n v. District Court,* 186 Colo. 278, 282, 527 P.2d 233, 234 (1974). Accordingly, until shown otherwise, we presume that decisions and orders of the PUC are reasonable and valid. *See City of Montrose,* 629 P.2d at 623.

■ Upon review, we view the evidence of record in the light most favorable to the PUC and give deference to the PUC's findings and decision. *See Peoples Natural Gas Div. of Northern Natural Gas Co. v. Public Utils. Comm'n,* 193 Colo. 421, 427, 567 P.2d 377, 381 (1977). The objecting party has the burden of proving that the PUC's decision is unlawful. *See Northwest Water Corp.,* 168 Colo. at 172, 451 P.2d at 275. However, if this demonstration is made, we will set aside the PUC decision and remand for any necessary further proceedings. *See Mountain States Legal Found. v. Public Utils. Comm'n,* 197 Colo. 56, 590 P.2d 495 (1979).

■ The substantial evidence standard applies to judicial review of a PUC rate decision. "[W]hile the findings and conclusions of the commission are presumed to be valid, and must be reviewed in the light most favorable to the commission's decision, a PUC decision that is not supported by substantial evidence must be set aside." *Home Builders Ass'n of Metro. Denver v. Public Utils. Comm'n,* 720 P.2d 552, 560 (Colo.1986) (citations omitted). However, if substantial evidence exists, "the judicial inquiry is at an end, for the reviewing court is not permitted to substitute its judgment for that of the Commission." *Colorado–Ute Elec.,* 760 P.2d at 641.

■ Determining whether the decision is supported by substantial evidence is a question of law, *see Atchison, Topeka, & Santa Fe Ry. v. Public Utils. Comm'n,* 763 P.2d 1037, 1042 (Colo.1988), and "a court must view the evidence in the record in the light most favorable to the Commission." *Colorado Office of Consumer Counsel,* 786 P.2d at 1091. Substantial evidence has been defined by this court as:

> more than a scintilla, and [it] must do more than create a suspicion of the existence of the fact to be established. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," ... and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.

*Integrated Network Servs., Inc. v. Public Utils. Comm'n,* 875 P.2d 1373, 1378 (Colo.1994)(quoting *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939)).

With these principles in mind, we turn to the PUC's decision in this case.

## B.

### The PUC's Interruptible Rate Resource Decision

In this proceeding, the PUC performed its most fundamental task, a comprehensive review of the rates charged by a privately owned public utility company whose service substantially affects the health and welfare of Colorado citizens and businesses. The PUC received voluminous pre-filed written testimony and held a multi-day hearing which involved businesses, consumer advocates, and government agencies entrusted with advocating important public goals, such as energy conservation and consumer protection.

■ As the PUC examines individual rate proposals in the context of integrated resource planning, the Commissioners must necessarily consider how best to implement rate adjustments which (1) continue to allocate fixed and variable costs between all classes of service, (2) provide for continuity and stability in residential and other classifications of rates while providing service incentives to large commercial and industrial customers, and (3) implement integrated resource decisionmaking, all in a just and reasonable manner. Because the PUC engages in an open public process of consultation and dialogue with a wide spectrum of affected interests and is empowered to exercise legislative type judgment in setting rates after considering the oral and written presentations, we defer to the Commission's decision unless the result is unreasonable or unjust.

The Commissioners here issued a detailed written decision, supplemented in writing on rehearing, in which they found facts and explained their policy choices. With regard to interruptible rates, PSCo had proposed to create six subclasses of a very few users of electricity who would receive a substantial price advantage over firm service that was not available to the vast majority of the company's customers. Only the largest users of electrical service could qualify. The rational basis for such a proposal, which otherwise might appear to discriminate against smaller customers who have no choice but to accept firm service and pay firm service rates, is that these large commercial and industrial accounts can provide PSCo with a substantial load management capability by declining service during occasional maximum demand periods.

Viewing interruptible service as a demand side resource, the PUC determined to modify PSCo's proposal to automatically award to the interruptible customers 100% of the adjusted avoided capacity cost. In arriving at the 80/20 split between a guaranteed discount for choosing interruptible service and an earn back credit for actually being interrupted, the PUC considered both (1) the cost of acquiring the interruptible rate resource and (2) the risk and actuality of interruptions to customers in this rate category.

### 1. Cost of Acquiring the Interruptible Rate Resource

■ CF & I and Cyprus argue that "[o]ne of the fundamental principles of electric power rate design is that rates charged should accurately reflect the utility's actual cost of providing service." *Colorado–Ute Elec.*, 760 P.2d at 642. We agree that the cost of service is a basic and often determinative factor for the PUC to consider in the course of ratemaking. We do not agree, however, that the PUC has no choice but to award the entire avoided capacity cost to the interruptible customers in the first instance.

We have repeatedly stressed that ratemaking is not an exact science, but, rather, a matter of reasoned judgment. *See Colorado Office of Consumer Counsel*, 786 P.2d at 1096 ("[M]athematical precision is not the standard by which we judge the Commission's actions."); *City of Montrose*, 629 P.2d at 623 ("Rate making is not an exact science but a legislative function involving many questions of judgment and discretion."). Here, the proposed discount was based on the *estimated* costs of building another generator. Dr. Johnson testified that "if the cost savings are overestimated to the slightest degree, other customers will tend to be adversely affected by the interruptible rate discount."

Even if a more precise figure were available for the avoided costs, PSCo proposed to use that amount as a *proxy* to establish what its costs would have been if the interruptible resource were not available. But, employing interruptible service as an alternative to building more generators does not mean that both resources must inevitably be acquired at the same cost. As the OEC argued, the true cost of providing interruptible service might be viewed alternatively as that level of discount from the firm rate which will induce enough customers to accept interruptions to provide the desired load management benefit.[10] Since PSCo elected to treat interruptible service as a demand side resource, it would not be unreasonable to ascertain that resource's market value and to use that value in assessing the cost to the utility of providing interruptible service.[11]

Whether or not to pursue a bidding approach to test the market value under the circumstances here was within the PUC's discretion. The Commission chose instead to provide interruptible customers with a guaranteed benefit of 80% of the adjusted avoided costs, with a graduated earn back credit of an additional 20%, for a total 100% credit, to the customer that experiences ten interruptions during the billing year.

■■ CF&I and Cyprus argue that substantial evidence did not exist to support the PUC's decision in this regard. Appellants claim in particular that the OCC's position in favor of reducing the credit to 80% of the avoided capacity cost was "unsupported by any analysis, study, data, precedent or authority," and, thus, lacked empirical support.

We have rejected a similar argument in addressing the contention that PUC decisions should be based upon quantitative evidence supported by empirical data. In *Integrated Network Services*, 875 P.2d at 1381, we observed that

> [w]hile it is true that quantitative information may be helpful in determining an appropriate rate for a public utility, it is not the only type of evidence that may support a decision of the PUC.... Indeed, to require an administrative agency to support all of its ratemaking decisions with empirical data would impair the ability of such agencies to use their expertise and discretion to determine appropriate rates.

*Id. See also Atchison, Topeka & Santa Fe Ry.*, 763 P.2d at 1043 (while the PUC "did not gather statistical or other empirical evidence" to support their findings; "[n]either [the relevant statutory provision] nor the principles of administrative law ... so limits the evidence the Commission may consider").

In this case, the PUC's decision finds support in the testimony of several PSCo witnesses who stated that the company intended to treat interruptible service as a demand management resource within the context of its integrated resource plan.[12] In agreeing with a resource-based analysis, while modifying PSCo's proposal, the PUC explained that

> [w]hile we agree that consumers on the [interruptible] rate are customers, we also note that [interruptible] service is also a load management tool for Public Service. As such, the relationship between [interruptible] consumers and the Company is not simply that of utility provider and cus-

---

10. An interruptible customer can always elect to receive firm service. If enough customers withdraw from the program, the PUC may have to reconsider the appropriate rates in order to ensure an adequate supply of this resource, or provide for added capacity.

11. We have previously upheld a decision of the PUC stating that while they favored cost-based pricing, "at times externalities will require some deviation from a strictly cost-based pricing method in order that the rates are just and reasonable." *Colorado Office of Consumer Counsel*, 786 P.2d at 1097 (market externalities can justify the use of below cost rates for certain customers).

12. PSCo witness Matt Harris testified that

Public Service is purchasing a demand-side resource from our customers. The purchase of this "capacity" must be consistent with the manner in which all other resources are considered and valued on our generation system. While this approach may not be consistent with how costs are allocated for rate design purposes, it is consistent with how supply and demand-side resources are valued in the Integrated Resource Planning process. While Public Service witness Moore addresses the AED method as the appropriate method for assigning costs to individual customer classes, Public Service's IRP process is the appropriate manner in which to determine the value of the interruptible resource to our generation system.

tomer. We further note that Public Service is not legally required to offer [interruptible] service to ratepayers. Its public utility obligation to serve would be met if it simply offered firm service to all at non-discriminatory rates. In contrast to the intervenors' characterization of [interruptible] service, the [interruptible] rate may be viewed as firm service with a separate credit applied for a customer's willingness to interrupt at specified times. The Intervenors' discrimination argument is, in effect, that the Company must offer the same credit for all load management resources. We do not believe this interpretation of the statutes is correct.

■ The PUC was justified in taking into account the OEC testimony suggesting that interruptibility should be acquired at the lowest cost possible.[13] While declining to follow the OEC's suggestion that interruptible rates be priced through a bidding process, the PUC agreed that the full avoided capacity cost should not be awarded entirely to the interruptible customers unless a certain number of interruptions actually occur.

Dr. Johnson testified that PSCo's proposed interruptible rates

provide[d] a lopsided result ..., since 100% of the benefits flow to the interruptible customer, with none of the benefits flowing to the Company and its other customers.... [S]ince the interruptible discounts are currently not available to all customers, ... the Commission should be conservative in establishing the magnitude of these discounts, to ensure that they are fair to all customers, including those who are not allowed to receive service on an interruptible basis.

The PUC concluded that the OCC's proposed approach was a "prudent and cautious adjustment to ensure that other rate payers are protected from paying interruptible customers too much for this 'resource.'" Since this determination finds support in the record, we will not set it aside.

*2. Risk and Actuality of Interruption*

■ Although cost of service is an important consideration in setting an appropriate utility rate, we have previously recognized that the PUC's ratemaking discretion includes the reasoned use of various other factors which are rationally related to legitimate utility regulatory purposes:

[W]hile cost-of-service may be a factor, it is certainly not the exclusive factor to be considered in a ratemaking decision of the PUC. Indeed, if such were the case, the PUC would have little ratemaking discretion; rather, it would become a rubber stamp relegated to examining cost studies of utilities.

*Integrated Network Servs.*, 875 P.2d at 1383.

Here, the PUC took into account the historically demonstrated low risk of interruption when designing the interruptible rate. The OEC's evidence illustrated that relatively few interruptions occurred during an eleven year period. Over this time, there were no capacity related interruptions in seven of the years, and no more than four interruptions in a single year. To the extent that an interruptible customer suffers little or no interruption of its service, the utility might be viewed as providing essentially firm service at a preferential and, perhaps, discriminatory discount. The PUC evidently agreed that a guaranteed discount to the interruptible customers of 100% of the estimated avoided gas turbine cost might operate to provide a windfall.

CF&I and Cyprus argue that the PUC did not take into account the costs which interruptible customers incur as a result of agreeing to accept interruptible service. However, it is not possible for the PUC to determine with precision how an interruptible custom-

---

**13.** As expressed by OEC witness Gretchen McClain,

If PSCo needed a supply-side resource, I would expect PSCo to take steps to acquire the resource at least cost, and not simply pay a provider the maximum value that resource might have to the Company. For example, if the Company were seeking to purchase a combustion turbine, I would expect PSCo to select the vendor who offered the turbine at lowest cost, all other things being equal. In general I would expect PSCo to make use of competition among suppliers to lower costs. However, competition is completely absent in PSCo's approach to the acquisition of interruptible capacity.

er's individual costs will be affected or what will lead a customer to choose interruptible service. While an interruptible customer may incur some costs regardless of whether an interruption ever occurs, other costs will be incurred only if and when service is curtailed. For example, an interruptible customer may purchase a generator to keep its facilities running in the event of a curtailment. This initial cost is incurred regardless of the number of interruptions; however, the additional cost of running the backup generator will depend exclusively upon the number of interruptions. In another case, a company may simply choose to shut down all or a part of its operations when service is interrupted; costs in this scenario are incurred only upon interruption. Further, interruptible customers may choose to shift their production to periods when an ample supply of electricity will be available, thereby minimizing or avoiding the effects of being interrupted.

There is no way to make a universal calculation or prediction of the costs customers will incur to prepare for and endure interruptions, or, in view of the costs, whether those customers will or will not subscribe to interruptible service. Interruptible rates are a great incentive and benefit to selected customers with a large demand for electricity. The PUC did not act unreasonably in determining that the amount of the customer's actual discount from firm rates should be based at least in part on the number of interruptions which actually occur.

As we have previously stated, "Rate fixing involves more than finding of facts and applying them. It involves also to a considerable extent many questions of judgment or discretion on the part of the PUC.... [T]he PUC must have before it evidence on the subject matter, but the determination as to what is a fair, just and reasonable rate is a matter of judgment or discretion." *Mountain States Tel. & Tel. Co. v. Public Utils. Comm'n*, 182 Colo. 269, 280, 513 P.2d 721, 726 (1973). By structuring the interruptible rates to provide incentives for curtailment to certain large customers, while ensuring that the utility and the firm customers do not pay too much for this demand side management resource, the PUC made a reasoned determination.

## III.

Because substantial evidence exists in the record to support the PUC's decision, and because that decision is not unjust or unreasonable, we affirm the judgment of the district court upholding the PUC's determination.

Justice BENDER does not participate.