1
 2025 CO 1 Holcim U.S. Inc., Petitioner-Appellant v. Colorado Public Utilities Commission, Eric Blank, Megan M. Gilman, and John Gavan, Respondents-Appellees: and Black Hills Colorado Electric LLC and Office of the Utility Consumer Advocate. Intervenors-Appellees: No. 24SA46
Supreme Court of Colorado, En Banc
January 13, 2025
 
           Appeal
 from the District Court District Court, City and County of
 Denver, Case No. 22CV30911 Honorable Andrew J. Luxen, Judge
 
 
          
 Attorneys for Petitioner-Appellant: Keyes & Fox, LLP Mark
 T. Valentine Denver, Colorado
 
 
          
 Attorneys for Respondents-Appellees: Philip J. Weiser,
 Attorney General Paul C. Gomez, First Assistant Attorney
 General Alex J. Acerra, Assistant Attorney General Denver,
 Colorado
 
 2
 
          
 Attorneys for Intervenor-Appellee Black Hills Colorado
 Electric LLC: Emanuel T. Cocian Greg E. Sopkin Denver,
 Colorado
 
 
           Taft
 Stettinius & Hollister LLP Elizabeth M. Brama Valerie T.
 Herring Denver, Colorado
 
 
          
 Attorneys for Intervenor-Appellee Office of the Utility
 Consumer Advocate: Philip J. Weiser, Attorney General Gregory
 E. Bunker, Senior Assistant Attorney General II Thomas F.
 Dixon, First Assistant Attorney General Denver, Colorado
 
 
          
 JUSTICE GABRIEL delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE HOOD,
 JUSTICE HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER
 joined.
 
 3
 
          
 OPINION
 
 
          
 GABRIEL, JUSTICE
 
 
          ¶1
 In this appeal taken pursuant to section 40-6-115(5), C.R.S.
 (2024), the appellant, Holcim U.S. Inc., contends that the
 Colorado Public Utilities Commission (the "PUC")
 (1) set an unjust and unreasonable charge for electricity
 over a five-day period because the charge allegedly had no
 relationship to the electricity that Holcim used during that
 period and disproportionately allocated utility costs to
 Holcim and (2) committed a taking in violation of the Fifth
 Amendment when it purportedly set an excessive charge for
 Holcim without evidence that the charge reflected the cost of
 service rendered by the electric utility, Black Hills
 Colorado Electric LLC.
 
 
          ¶2
 Applying the deferential standard of review that we afford
 the PUC, we now conclude that the charge that the PUC imposed
 was just and reasonable. We further conclude that although
 Holcim did not adequately develop its takings claim, it did
 present a due process claim. As to that claim, we conclude
 that Holcim did not establish a violation of its due process
 rights here.
 
 
          ¶3
 Accordingly, we affirm the district court's judgment
 upholding the PUC's determination in this case.
 
 
          I.
 Facts and Procedural History
 
 
          ¶4
 From February 13 through February 17, 2021, Black Hills and
 other utilities serving Colorado customers faced a severe
 arctic cold weather event that came to
 
 4
 
 be called "Winter Storm Uri." During this weather
 event, natural gas wells and production and processing
 facilities in certain parts of the United States froze off,
 taking a major portion of the nation's gas supply
 offline. At the same time, the record-breaking cold
 temperatures led to increased demand for natural gas.
 
 
          ¶5
 To ensure sufficient natural gas supplies to allow it to
 continue providing electric service to its customers during
 the extreme weather event, on February 12, 2021, Black Hills
 made spot market purchases for the four-day period beginning
 on February 13 (Black Hills ultimately did not make any daily
 gas purchases on February 16 for delivery on February 17).
 Due to the extreme and persistent cold temperatures, Black
 Hills made these purchases based on the highest of its
 forecasted requirements for the ensuing four-day period.
 
 
          ¶6
 The interplay of the extreme cold, freeze-offs of natural gas
 production, and high customer demand for natural gas greatly
 impacted natural gas prices during this period. Before
 February 12, daily natural gas prices hovered around $3 per
 dekatherm ("Dth"). During the day on February 12,
 in contrast, daily prices for gas to be delivered on February
 13 began spiking, resulting in midpoint settlement prices
 ranging from $187.69 to $224.56 per Dth. Prices remained at
 heightened levels through February 18.
 
 
          ¶7
 As a result of these price increases, the average price that
 Black Hills paid for its baseload and daily gas purchases for
 Winter Storm Uri was $106.32 per Dth,
 
 5
 
 resulting in total natural gas costs of $23,188,089 for the
 five-day period from February 13 through February 17, 2021.
 Black Hills then sought to recover these extraordinary costs.
 
 
          ¶8
 In order to mitigate "rate shock" to customers and
 to assess whether Black Hills and other utilities prudently
 incurred these kinds of extraordinary costs, the PUC ordered
 the utilities to delay charging customers for their natural
 gas purchases during the extreme weather event and to submit
 an application to the PUC for approval of a cost recovery
 method.
 
 
          ¶9
 In accordance with the PUC's order, Black Hills filed a
 verified application to recover the extraordinary costs that
 it had incurred. PUC Trial Staff, the Colorado Office of the
 Utility Consumer Advocate, and the Colorado Energy Office
 then intervened as of right in the proceeding that Black
 Hills had initiated, Holcim permissively intervened, and the
 PUC referred the matter to an administrative law judge
 ("ALJ") for consideration.
 
 
          ¶10
 Subsequently, all of the parties to the proceeding except
 Holcim entered into a proposed settlement agreement, which
 they presented to the ALJ for approval. This settlement
 agreement proposed an Extraordinary Gas Cost Recovery Rider
 ("Recovery Rider") that would be charged to Black
 Hills customers on a volumetric basis in the same way that
 Black Hills's usual cost recovery method, the
 "Energy Cost Adjustment" ("ECA"), is
 applied to customers.
 
 6
 
          ¶11
 Black Hills ordinarily recovers its natural gas costs through
 the ECA. The ECA is a volumetric charge applicable to all
 rate schedules, meaning that Black Hills charges its
 customers a uniform per-kilowatt-hour rate on their
 electricity usage. In imposing this charge, Black Hills
 directly passes on the costs of natural gas to customers and
 does not profit from this pass through. This type of rate
 structure is known as a "fuel adjustment clause,"
 and it is common throughout the United States. See
 Sandra L.K. Davidson, Annotation, Validity of "fuel
 adjustment" or similar clauses authorizing electric
 utility to pass on increased cost of fuel to its
 customers, 83 A.L.R.3d 933, § 2(a) (1978); 64 Am.
 Jur. 2d Public Utilities § 111 (2024).
 
 
          ¶12
 The settlement agreement proposed that Black Hills would pass
 the extraordinary gas costs that it incurred during Winter
 Storm Uri on to its customers through a similar uniform
 volumetric rate applicable to all rate schedules. The
 principal difference was that Black Hills proposed to pass on
 the extraordinary costs over a longer period of time.
 Specifically, whereas under the ECA, Black Hills would have
 passed these costs on to customers over a twelve-month
 period, under the Recovery Rider, Black Hills would amortize
 these costs over a two-year period, lessening the "rate
 shock" that customers would have experienced had Black
 Hills sought to recover the extraordinary costs over the
 shorter period of time.
 
 7
 
          ¶13
 Holcim, which, at the time, was among Black Hills's
 largest retail electric customers, alone opposed this
 proposed settlement. In its view, the proposed Recovery Rider
 would have required it to pay more than its fair share of the
 costs associated with Winter Storm Uri because it claimed to
 have conserved energy during that weather event and thus used
 substantially less electricity during that period than it did
 in the ensuing ten days. According to Holcim, this resulted
 in almost $2.57 million in avoided fuel costs, exclusive of
 carrying costs.
 
 
          ¶14
 Holcim further claimed that applying a single volumetric rate
 to it would be unfair and would violate the principle that
 rates should be based on cost-causation principles to the
 extent possible. A more equitable design, Holcim asserted,
 would allocate the costs that Black Hills had incurred in
 connection with the weather event based on the proportional
 energy use of Black Hills's retail customers during that
 event, as opposed to during the ensuing two years. Holcim
 thus proposed an alternative rate design under which
 volumetric rates would have varied by customer class (e.g.,
 residential, small general service, large general service,
 large power service, and lighting). Under Holcim's
 proposal, approximately $2 million of Black Hills's
 extraordinary costs would have shifted to the residential
 class, while the costs to be paid by Holcim would have
 decreased substantially.
 
 
          ¶15
 The ALJ rejected Holcim's proposal, concluding that it
 was not in the public interest. The ALJ reached this
 conclusion for six primary reasons. First, the ALJ
 
 8
 
 observed that the PUC had previously decided that Black Hills
 must recover fuel costs through the ECA, and the PUC had
 suggested that a similar mechanism should be used to recover
 the extraordinary costs incurred during Winter Storm Uri.
 Second, adopting Holcim's approach would call into
 question the ECA, which the PUC had already decided was in
 the public interest. Third, the proceeding before the ALJ was
 not a "Phase II rate proceeding," in which Black
 Hills's costs would have been allocated based on a class
 cost of service study and in which the rate would have been
 determined based on such cost allocations. Here, the ALJ
 noted, because no class cost of service study had been
 conducted, there was no evidence from which the ALJ could
 determine whether it would be proper to reallocate costs
 between ratepayer classes. Fourth, the evidence did not
 establish any efforts by Holcim to conserve electricity
 during the weather event. Fifth, Holcim had proposed a rate
 based on the principle of cost causation that applied only to
 it, while failing to propose individual rates for other
 ratepayers who had consumed less electricity than normal
 during Winter Storm Uri. In the ALJ's view, such a result
 would not be just and reasonable. Finally, Holcim's
 approach would likely have required extending the
 amortization period beyond two years, but, the ALJ noted,
 this would not have been acceptable to Black Hills because it
 would have extended Black Hills's carrying costs.
 
 9
 
          ¶16
 In contrast, the ALJ determined that the compromises reached
 by the settling parties in the proposed settlement agreement
 produced a just and equitable result for Black Hills, its
 ratepayers, and the other parties to the proceeding. In
 particular, the ALJ found that the Recovery Rider's
 volumetric rate, as agreed to by the parties to the
 settlement agreement, was just and reasonable.
 
 
          ¶17
 Holcim then filed exceptions to the ALJ's ruling with the
 PUC. In its exceptions, Holcim reiterated its argument that
 the Recovery Rider did not reflect the costs of service and
 was not just and reasonable because it resulted in
 Holcim's paying over $2.6 million more than it believed
 was appropriate based on its electricity usage during the
 weather event. Holcim also argued, for the first time, that
 the rate proposed in the settlement agreement and approved by
 the ALJ amounted to an unconstitutional taking without due
 process because, in Holcim's view, the ALJ's decision
 was not supported by sufficient findings and explanation.
 
 
          ¶18
 The PUC rejected Holcim's arguments and approved the
 settlement agreement.
 
 
          ¶19
 Regarding Holcim's contentions as to its electricity use
 during the weather event, the PUC concluded:
 
 
 Holcim's (or any individual ratepayer's) actual use
 over [the weekend of the weather event] had no bearing on the
 costs Black Hills incurred. The record indicates that Black
 Hills went to market to procure natural gas based not on a
 real-time assessment of use during the weekend, but rather
 based on its two-day-ahead forecasts. Those forecasts were
 completed before the weather event had begun.
 
 10
 
 Therefore, the record indicates that Holcim's actual
 usage (or any other individual customer's actual usage)
 was not a cause of Black Hills incurring the extraordinary
 fuel costs. The determination to incur those costs had taken
 place prior to and independent of Holcim's use during the
 event.
 
 
 . . . There was also no evidence that at any point prior to
 or during the extreme weather event that Holcim notified
 Black Hills that it was going to conserve energy. The record
 shows that the expert witness Holcim hired did not know why
 the company's usage was lower than might be projected for
 that holiday weekend. And Staff and Black Hills witnesses
 testified that it would be imprudent for Black Hills to
 reduce the amount it was purchasing without firm indications
 of how much conservation would be taking place. So, neither
 Holcim's actual use nor its actions impacted Black
 Hills' need to incur the extraordinary fuel costs.
 
 
 (Footnotes omitted.)
 
 
          ¶20
 Regarding Holcim's proposed rate structure, the PUC
 concluded that Holcim's proposal would have constituted
 an illegal preferential rate for Holcim, in violation of
 section 40-3-106(1)(a), C.R.S. (2024).
 
 
          ¶21
 Finally, the PUC considered and rejected each of Holcim's
 constitutional claims. As to Holcim's takings claim, the
 PUC concluded, contrary to Holcim's underlying premise,
 that there is no constitutional right to a just and
 reasonable rate. Even if there were, however, the PUC
 concluded that the Recovery Rider did not violate any such
 right. And as to Holcim's claim that its due process
 rights were violated because the ALJ allegedly did not make
 sufficient findings or provide sufficient reasons to support
 his conclusions, the PUC determined that whatever
 shortcomings Holcim perceived with the ALJ's decision,
 the PUC had
 
 11
 
 remedied them by directly addressing Holcim's arguments.
 Specifically, the PUC observed that it had explained why
 Holcim's proposed rate design was unworkable and why the
 Recovery Rider was appropriate. As a result, the PUC
 concluded that Holcim was not deprived of any due process
 rights.
 
 
          ¶22
 Holcim then sought judicial review of the PUC's decision
 in the district court, and that court ultimately affirmed the
 PUC's decision. The court found, among other things, that
 "a rate which treats all customers the same and reflects
 cost causation, the total customer usage forecast, is just
 and reasonable and is not arbitrary." Holcim U.S.
 Inc. v. Colo. PUC, No. 22CV30911, at *11 (Dist. Ct.,
 City &Cnty. of Denver, Dec. 17, 2023). In addition, the
 court rejected Holcim's constitutional claims, finding
 that Holcim had not shown how the PUC's ratemaking
 constituted an unconstitutional taking and had not
 established any violation of its due process rights.
 Id. at *13-15.
 
 
          ¶23
 Holcim now appeals to this court.
 
 
          II.
 Analysis
 
 
          ¶24
 We begin by setting forth the applicable standard of review
 and basic principles concerning the PUC's rate-making
 authority. We then address whether the PUC adopted a just and
 reasonable rate when it approved the Recovery Rider, and we
 conclude that it did. Last, we consider and reject
 Holcim's constitutional claims.
 
 12
 
          A.
 Standard of Review and Applicable Legal Principles
 
 
          ¶25
 Colorado law vests in the PUC the authority to regulate rates
 charged by public utilities for service in this state. Colo.
 Const, art. XXV; § 40-3-102, C.R.S. (2024). The PUC
 "exists to protect consumers while affording monopoly
 status to the utility provider. To further this purpose, and
 pursuant to its constitutional and statutory mandate, the
 Commission's essential function is to ensure that all
 rate charges are fair and reasonable to ratepayers and the
 utility." Pub. Serv. Co. of Colo. v. Pub. Utils.
 Comm'n, 26 P.3d 1198,1204 (Colo. 2001).
 
 
          ¶26
 Judicial review of PUC rate decisions is relatively narrow,
 and courts extend considerable deference to the PUC's
 factual determinations. CF&I Steel, L.P. v. Pub.
 Utils. Comm'n, 949 P.2d 577,584 (Colo. 1997);
 Colo.-Ute Elec. Ass'n v. Pub. Utils. Comm'n,
 760 P.2d 627, 640 (Colo. 1988). In addition, this court has
 recognized that "[r]ate making is not an exact science
 but a legislative function involving many questions of
 judgment and discretion." City of Montrose v. Pub.
 Utils. Comm'n, 629 P.2d 619, 623 (Colo. 1981). Thus,
 courts review PUC decisions solely to determine whether (1)
 the PUC "has regularly pursued its authority,"
 including a determination as to whether the PUC decision at
 issue violates any rights of the petitioner under the United
 States or Colorado Constitutions; (2) the PUC's decision
 is "just and reasonable"; and (3) the PUC's
 "conclusions are in accordance with the evidence."
 § 40-6-115(3).
 
 13
 
          ¶27
 Here, Holcim alleges that the Recovery Rider is not just and
 reasonable because it does not charge Holcim for the actual
 electricity that it consumed during the weather event.
 Accordingly, we will focus on the "just and
 reasonable" requirement.
 
 
          ¶28
 In the context of reviewing a PUC rate-setting decision, we
 explained:
 
 
 Under the prevailing norms of utility regulation, rates are
 to be set at a level that covers the utility's legitimate
 costs and expenses in providing service to the public and a
 reasonable rate of return on its investment. Accordingly, the
 primary matters for PUC determination in the public interest
 are: (1) sufficiency of the rates to recompense the utility
 and maintain its operational viability for the purpose of
 serving the public; and (2) distribution of the revenue
 requirement between the various customer classes in a just
 and reasonable manner.
 
 
 CF&I Steel, 949 P.2d at 584; see also Pub.
 Serv. Co. of Colo. v. Pub. Utils. Comm'n, 644 P.2d
 933, 939 (Colo. 1982) (noting that "[t]he fixing of
 'just and reasonable' rates involves a balancing of
 investor and consumer interests" and that "[t]he
 PUC must therefore set rates which protect both: (1) the
 right of the public utility company and its investors to earn
 a return reasonably sufficient to maintain the utility's
 financial integrity; and (2) the right of consumers to pay a
 rate which accurately reflects the cost of service
 rendered").
 
 
          ¶29
 We have also made clear that, "[s]ince rate setting is a
 legislative function which involves many questions of
 judgment and discretion, courts will not set aside the rate
 methodologies chosen by the PUC unless they are inherently
 unsound." CF&I Steel, 949 P.2d at 584;
 see also Pub. Utils. Comm'n v. Nw. Water Corp.,
 451 P.2d 266, 275 (Colo. 1969)
 
 14
 
 ("[I]n a question of rate-making there is a strong
 presumption in favor of the conclusions reached by an
 experienced administrative body after a full hearing.")
 (quoting Darnell v. Edwards, 244 U.S. 564, 569
 (1917)).
 
 
          ¶30
 "The objecting party has the burden of proving that the
 PUC's decision is unlawful." CF&I
 Steel, 949 P.2d at 585.
 
 
          B.
 The Recovery Rider Is Just and Reasonable
 
 
          ¶31
 The first question before us is whether, in approving the
 Recovery Rider, the PUC adopted a just and reasonable rate.
 The question is not whether Holcim's alternative proposal
 was reasonable or provided a preferable recovery method.
 
 
          ¶32
 As noted above, a rate is just and reasonable when it
 protects the right of utility customers to pay a rate that
 accurately reflects the cost of service rendered, distributes
 costs among the customer base in a just and reasonable
 manner, and protects the utility's and its investors'
 rights to earn a return that is reasonably sufficient to
 maintain the utility's financial integrity. See
 CF&I Steel, 949 P.2d at 584; Pub. Serv.
 Co., 644 P.2d at 939. The Recovery Rider satisfies each
 of these criteria.
 
 
          ¶33
 The Recovery Rider accurately reflects the cost of service
 because, as discussed above, the PUC concluded, with ample
 record support, that Black Hills had purchased natural gas
 based on total forecasted customer need, not based on
 
 15
 
 actual individual consumption during Winter Storm Uri. This
 court has explained that "[a] major operating expense
 which the PUC must necessarily consider in arriving at a just
 and reasonable rate is the cost which [a utility] must pay to
 acquire natural gas from their suppliers." Pub.
 Serv. Co., 644 P.2d at 939. Here, Black Hills forecasted
 its customer needs during Winter Storm Uri using
 industry-standard methods that no party has contested.
 Moreover, it appears undisputed that Black Hills's
 natural gas purchases enabled it to provide to its customers
 uninterrupted service at normal usage volumes throughout the
 weather event, which was the very purpose for Black
 Hills's advance purchases. Accordingly, we conclude that
 the PUC reasonably determined that the Recovery Rider
 accurately reflects the cost of service rendered during
 Winter Storm Uri.
 
 
          ¶34
 We further conclude that the Recovery Rider distributes costs
 among Black Hills's customer base in a just and
 reasonable manner. As noted above, Black Hills incurred the
 extraordinary costs at issue based on its total forecasted
 load, to ensure that all of its customers had access to their
 normal volume of electricity during the storm; Black
 Hills's costs were not based on any individual
 customer's actual consumption during the storm. Black
 Hills then proposed distributing the costs that it had
 incurred on a volumetric basis applicable to all rate
 schedules. This, in turn, would allow Black Hills to recover
 the extraordinary costs that it had incurred in anticipation
 of Winter Storm Uri in exactly the same way that it
 
 16
 
 recovers its normal fuel costs through the EC A, which method
 the PUC has long determined is in the public interest.
 Accordingly, in approving the cost recovery design that Black
 Hills and the other parties to the settlement agreement had
 proposed, the PUC applied the Recovery Rider among all of
 Black Hills's customers in a just and reasonable manner.
 
 
          ¶35
 On this point, as Black Hills and the PUC noted in their
 briefing to us, the facts at issue in this case are in stark
 contrast with the facts in City of Montrose v. Public
 Utilities Commission, 590 P.2d 502, 504-05 (Colo. 1979).
 There, we determined that a utility's action in imposing
 on municipal, but not non-municipal, residents the costs of
 utility franchise charges was unjust and discriminatory
 because it resulted in municipal customers subsidizing and
 paying higher rates than non-municipal customers who were
 receiving the same service. Id. Here, in contrast,
 Black Hills's customers will be charged an
 identical rate, and customers' ultimate billing
 will appropriately be based on their individual usage.
 See Integrated Network Servs., Inc. v. Pub. Utils.
 Comm'n, 875 P.2d 1373, 1383-84 (Colo. 1994)
 (distinguishing City of Montrose on the ground that,
 unlike in that case, the rates ordered to be paid by the
 petitioning parties in the case before the court would be
 "charged based upon usage," and no evidence showed
 that the petitioning parties would be subsidizing other
 customers).
 
 17
 
          ¶36
 Finally, no party has asserted that the Recovery Rider fails
 to provide Black Hills with a reasonable rate of return, and
 given that Black Hills agreed to the Recovery Rider in the
 settlement agreement, we presume that it was satisfied with
 the rate of return provided thereby.
 
 
          ¶37
 For all of these reasons, we conclude that the rate
 established by the Recovery Rider is just and reasonable.
 
 
          ¶38
 We are not persuaded otherwise by Holcim's arguments that
 the rate does not reflect "cost causation" and that
 it charges Holcim a disproportionate amount.
 
 
          ¶39
 For the reasons discussed above, the Recovery Rider
 does reflect cost causation because Black Hills
 incurred the costs at issue based on its total forecasted
 load during the winter storm, and it is these costs that are
 being passed through to Black Hills's customers. As the
 PUC concluded below, Holcim's actual use during Winter
 Storm Uri had no bearing on the costs that Black Hills had
 incurred.
 
 
          ¶40
 Moreover, Holcim has not established that the Recovery Rider
 imposes disproportionate charges on it. Holcim's argument
 in this regard appears to be based on its incorrect
 assumption that the costs that Black Hills incurred were the
 result of customers' actual usage during the storm. As
 noted above, however, the costs at issue resulted from Black
 Hills's forecasted needs, which were determined
 prior to the extreme weather event.
 
 18
 
          ¶41
 Additionally, to the extent that Holcim is relying on its
 claim that it had conserved electricity during the storm, as
 the ALJ found, no evidence established that Holcim's
 usage during the storm was reduced as a result of any
 intentional conservation efforts on its part. Nor does any
 evidence in the record show that Holcim advised Black Hills
 in advance that it planned to lessen its electricity needs
 during the storm, which could potentially have impacted Black
 Hills's forecasted needs (as PUC Trial Staff and Black
 Hills witnesses testified, however, absent an indication of
 how much conservation would occur, it would have been
 imprudent for Black Hills to reduce the amount of natural gas
 that it was purchasing). Instead, Black Hills proceeded based
 on its forecasts, and all Black Hills customers, including
 Holcim, were able to satisfy their normal electricity needs
 throughout the storm.
 
 
          ¶42
 We are also unpersuaded by Holcim's apparent assumption
 that the question of a just and reasonable rate turns
 exclusively on the cost of service. As we said three decades
 ago, "[W]hile cost-of-service may be a factor, it is
 certainly not the exclusive factor to be considered in a
 ratemaking decision of the PUC. Indeed, if such were the
 case, the PUC would have little ratemaking discretion;
 rather, it would become a rubber stamp relegated to examining
 cost studies of utilities." Id. at 1383. Here,
 the record demonstrates that the PUC considered all of the
 relevant facts before it, including the parties' desires
 to avoid "rate shock,"
 
 19
 
 ensure rate stability by maintaining a similar rate design
 for similar costs, and provide for equal treatment of all of
 Black Hills's customers. See id.
 
 
          ¶43
 Finally, we note that Holcim cites no applicable authority
 prohibiting the type of uniform, volumetric rate for the
 recovery of fuel costs that the PUC imposed here. To the
 contrary, Colorado utilities have used fuel adjustment
 clauses like that at issue for at least fifty years. See
 Colo. Energy Advoc. Off. v. Pub. Serv. Co. of Colo.,
 704: P.2d 298, 300 (Colo. 1985). And other states'
 courts that have considered challenges to similar rate
 structures likewise have upheld them, further supporting our
 conclusion that the PUC adopted a just and reasonable rate in
 this case. See, e.g., Gulf Power Co. v. Fla. Pub. Serv.
 Comm'n, 487 So.2d 1036,1036 (Fla. 1986);
 Archer-Daniels-Midland Co. v. III. Com. Comm'n,
 704 N.E.2d 387, 397 (Ill. 1998); City of Chicago v. III.
 Com. Comm'n, 150 N.E.2d 776, 778-80 (Ill. 1958);
 State ex rel. Utils. Comm'n v. Edmisten, 230
 S.E.2d 651, 662-63 (N.C. 1976); City of Norfolk v. Va.
 Elec. & Power Co., 90 S.E.2d 140,141,149-50 (Va.
 1955).
 
 
          ¶44
 For these reasons, we conclude that Holcim has not met its
 burden of proving that the PUC's methodology was
 "inherently unsound." CF&I Steel, 949
 P.2d at 584. The PUC chose a rate that mirrors the structure
 that has been used to recover fuel costs in Colorado and
 throughout the United States for decades. Moreover, in
 allowing Black Hills to recover its extraordinary fuel costs
 while distributing those costs among all customers over a
 two-year period via a uniform,
 
 20
 
 volumetric rate, the PUC reasonably balanced customer
 interests, utility interests, and relevant factors such as
 cost causation, avoiding "rate shock," and rate
 stability.
 
 
          ¶45
 Accordingly, we conclude that the Recovery Rider that the PUC
 adopted in this case was just and reasonable.
 
 
          C.
 Holcim's Constitutional Claims
 
 
          ¶46
 Holcim next purports to assert two constitutional claims.
 First, it contends that the Recovery Rider constitutes an
 unconstitutional taking in violation of the Fifth Amendment.
 Second, Holcim argues that the PUC has violated Holcim's
 due process rights because, it asserts, the PUC's
 decision was not sufficiently supported by the evidence. We
 are not persuaded.
 
 
          ¶47
 Regarding Holcim's claim that the Recovery Rider
 constitutes an unconstitutional taking, Holcim presents no
 facts or law to support such a claim. Instead, it asserts, in
 conclusory fashion, that the Recovery Rider is so
 unreasonable that it constitutes a taking in violation of the
 Fifth Amendment. Such a conclusory statement does not suffice
 to develop a viable claim for appellate consideration, and we
 therefore decline to address that claim. See, e.g., Comm,
 for Better Health Care for All Colo. Citizens v. Meyer,
 830 P.2d 884, 890 (Colo. 1992) (concluding that a claim was
 not properly presented for appellate review when, among other
 things, the party's arguments "were stated in
 conclusionary form
 
 21
 
 [and] were not accompanied by citations to any
 authority"); Middlemist v. BDO Seidman, LLP,
 958 P.2d 486, 495 (Colo.App. 1997) (concluding that certain
 claims were not properly presented for appeal when the
 appellant had "fail[ed] to identify any specific errors
 committed by the trial court. . . and provide[d] no legal
 authority to support an allegation that the trial court erred
 in making its rulings").
 
 
          ¶48
 As for Holcim's due process claim, we note that in the
 context of rate-making, the Supreme Court has stated,
 "When the rate-making agency of the state gives a fair
 hearing, receives and considers the competent evidence that
 is offered, affords opportunity through evidence and argument
 to challenge the result, and makes its determination upon
 evidence and not arbitrarily, the requirements of procedural
 due process are met. . . R.R. Comm'n v. Pac. Gas
 & Elec. Co., 302 U.S. 388, 393-94 (1938). For the
 reasons set forth at length above, we conclude that the PUC
 has satisfied each of these requirements and that substantial
 evidence in the record supported the PUC's decision.
 
 
          ¶49
 Accordingly, Holcim has not established a violation of its
 due process rights in this case.
 
 
          III.
 Conclusion
 
 
          ¶50
 For these reasons, we conclude that, in approving the
 Recovery Rider, the PUC set a just and reasonable charge for
 the recovery of Black Hills's extraordinary
 
 22
 
 natural gas costs. We further conclude that Holcim has not
 established either an unconstitutional taking or a violation
 of its due process rights.
 
 
          ¶51
 Accordingly, we affirm the district court's judgment
 upholding the PUC's decision in this case.